**MONMOUTH LEGAL SERVICES ORGANIZATION, a nonprofit corporation of New Jersey, et al., Plaintiffs,**

v.

**Frank CARLUCCI, Director of the Office of Economic Opportunity, an instrumentality of the United States Government, Defendant.**

**Civ. A. No. 1137–71.**

United States District Court,
D. New Jersey.

Aug. 31, 1971.

Carton, Nary, Witt & Arvanitis, by Alexander D. Lehrer, Asbury Park, N. J., for plaintiffs.

Herbert J. Stern, U. S. Atty., by Roger Steffans, Asst. U. S. Atty., Newark, N. J., for defendant.

## MEMORANDUM and ORDER

LACEY, District Judge:

This action arises out of the Economic Opportunity Act of 1964, as amended (the Act) (42 U.S.C. § 2701, et seq.). Monmouth Community Action Program (MCAP) is a community action agency organized and designated as such pursuant to Title II of the Act, and as such operates a legal services program administered by Monmouth Legal Service Organization (MLSO) in accordance with § 2790 of 42 U.S.C. Funding of MLSO since its inception in 1968 has been largely by the Office of Economic Opportunity (OEO), pursuant to 42 U.S.C. § 2809(a) (3). OEO having now advised MLSO that after August 31, 1971, it will no longer be funded as an independent organization, but rather that it will be merged into the Ocean County Legal Services Organization (OCLSO), plaintiffs, being MLSO and other interested and affected organizations and persons, bring this suit to enjoin such action to the end that OEO be compelled to continue MLSO as a separate and independent legal services project under the Act. The pressing issue at this juncture is generated by plaintiffs' application for a preliminary injunction.

The statutory background follows:

42 U.S.C. § 2809 provides

(a) In order to stimulate actions to meet or deal with particularly critical needs or problems of the poor which

are common to a number of communities, the Director may develop and carry on special programs under this section. * * * Programs under this section shall include those described in the following paragraphs:

\*     \*     \*     \*     \*     \*

3. A "Legal Services" program to further the cause of justice among persons living in poverty by mobilizing the assistance of lawyers and legal institutions and by providing legal advice, legal representation, legal counseling, education in legal matters, and other appropriate legal services. Projects involving legal advice and representation shall be carried on in a way that assures maintenance of a lawyer-client relationship consistent with the best standards of the legal profession. The Director shall make arrangements under which the State bar association and the principal local bar associations in the community to be served by any proposed project authorized by this paragraph shall be consulted and afforded an adequate opportunity to submit, to the Director, comments and recommendations on the proposed project before such project is approved or funded, and to submit, to the Director, comments and recommendations on the operations of such project, if approved and funded. No funds or personnel made available for such program (whether conducted pursuant to this section or any other section in this part) shall be utilized for the defense of any person indicted (or proceeded against by information) for the commission of a crime, except in extraordinary circumstances where, after consultation with the court having jurisdiction, the Director has determined that adequate legal assistance will not be available for an indigent defendant unless such services are made available. * * *

It is pursuant to this statute that MLSO has been funded by OEO.

## THE FACTS

From time to time OEO makes on-site evaluations of local legal services programs. (45 C.F.R. § 1061.2–5). Such an evaluation of MLSO occurred in June, 1970. It was conducted at the direction of OEO by two representatives (O'Byrne and Bernwald) of other legal service programs. Their report was never furnished to MLSO, although specifically requested. The evaluators were, it is obvious, arrogant, crude, ignorant, and completely unqualified to render a dispassionate and objective judgment on the MLSO organizational and operational structure. The MLSO Director found them to be more interested in stimulating litigation than in whether MLSO was conforming to the requirements of the 1964 Act. In a letter of protest, never refuted or denied, he charged (Ex. P–2):

\*     \*     \*     \*     \*     \*

* * * they wished to know how many consumer groups we represented, how many tenant groups we represented, whether we participated in advising target area people in rent strike programs, how many actions we had against administrative agencies, and so forth.

\*     \*     \*     \*     \*     \*

* * * They made no attempt to evaluate our program as to what we were doing, our caseload, our management procedures, and so forth. They were interested only in militant and aggressive, direct action on the part of target area persons.

\*     \*     \*     \*     \*     \*

They informed me that their recommendation was to close down Monmouth Legal Services for failure to act sufficiently in the area of law reform and minority group organization and representation. * * *

* * * [They] were interested only in our failure to organize and advise militant groups for the purpose of conducting rent strikes and other protest movements.

\*     \*     \*     \*     \*     \*

* * * they responded that the MCAP program should be abolished for it is led by "Uncle Toms" and is not serving the community.

\* \* \* \* \* \*

They then told me what their recommendations were going to be again since the MCAP program was no good, the Monmouth Bar Association was no good, and the Board of Trustees of Monmouth Legal Services was no good. \* \* \*

There must have been even within OEO concern over the validity of this evaluation and so MLSO was evaluated again in September, 1970, by representatives of Auerbach Associates, Inc. A so-called "Pre-Site Profile", probably prepared preliminarily by an Auerbach employee, referred to the June evaluation. (Ex. P–4). This Profile was inadvertently left with MLSO's Director during the Auerbach evaluation conference. The Profile, commenting upon the prior June evaluation report, states:

They open their comments on the project with: "Monmouth County Legal Services Organization (MCLSO) is in the opinion of the evaluators, a 'legal aid' type project, totally devoid of positive features in the area of law reform and community organization, and therefore, should not be refunded."

The Profile also stated that the earlier evaluators reported that the Monmouth County Bar Association controlled MLSO's program and that the Board of MLSO was controlled by a certain named lawyer who "is a conservative who has little interest in test litigation and group representation." According to this Profile, the evaluators further stated that as long as the named lawyer controlled the program MLSO "will continue to be an ineffectual legal aid operation."

What effect this Pre-Site Profile had on the ultimate evaluation of the Auerbach representatives is unknown. Also unknown is whether the full report of the earlier evaluators was turned over to Auerbach, and, if so, the extent to which the Auerbach report was influenced by that earlier report. In an undated letter from Ronald M. Dietrich, Acting Associate Deputy Director for Legal Services in OEO, received by MLSO on or about January 8, 1971, it was stated (Ex. P–15):

\* \* \* The Office of Legal Services has not relied on the June 1970 evaluation. That evaluation contains matter highly critical of the program and of certain personnel in the program. As it is, in addition, irrelevant to this proceeding, I am reluctant to release it. Because no one used the June 1970 report in preparing the proposals affecting Monmouth Legal Services, I do not believe you will be prejudiced by not having it.

It must be reiterated, however, that the record fails to disclose whether or not the Auerbach report was influenced by the earlier evaluation. That the OEO did rely on the Auerbach report is, as will later appear, clear beyond doubt. It was of course Mr. Dietrich, the writer of this letter, who made the decision which has led to this litigation. Plaintiffs were unable to explore this assertion made by him since he flatly refused to testify at the hearing conducted on this application, which led to this Court's granting plaintiffs' motion to strike his affidavit filed in opposition to the motion for the preliminary injunction. Nor was the plaintiffs' counsel able to examine the defendant's file on MLSO and the action taken with respect thereto. Although the Court directed counsel to produce it, it was the position of the defendant that it would not do so.

Even before the Auerbach Report (Ex. P–4), MLSO was advised that the decision had been tentatively made to deny further refunding to MLSO as an independent agency, and to merge it into Ocean County Legal Services Organization (OCLSO). This decision was based largely, if not wholly, upon the recommendation of P. Vaughn Gearan, Regional Director of the Office of Legal Services for Region 2, which includes New Jersey. His recommendation provided as follows (Ex. P–3):

\* \* \* Having monitored the performance of both programs over the past several years, we feel that com-

bining the efforts and resources now allocated to each program will effect substantial savings in overall administrative cost while at the same time enhancing the quality of legal services now being provided to the poor of both counties.

Mr. Gearan testified at length on the first day of the hearing. Plaintiffs' counsel cross examined him at that time, halting only when proceedings were recessed and only after being assured he would have further opportunity for cross examination on the next hearing day. Shockingly, the government elected to refuse to produce Mr. Gearan thereafter. However, plaintiffs' counsel chose not to move to strike his testimony.

Mr. Gearan was asked on what his recommendation was based. Initially, he stated he relied largely upon the Auerbach Report, an incredible assertion since, as later was developed, his recommendation was made prior to the Auerbach Report. He relied as well upon recommendations made by the New Jersey Department of Community Affairs. (See letter of April 2, 1970, from Carl F. Bianchi, Staff Attorney, State Office of Legal Services, to MLSO—part of Ex. P-4).

Subsequently Mr. Gearan revised his testimony, indicating that his initial recommendation was based upon financial considerations plus the State report; and that thereafter the Auerbach Report only served to confirm him in his thinking.

Additionally, Mr. Gearan worked very closely with the State Office.

He also relied upon his own experience (T–75):[1]

I relied, as I had stated, I believe, on some of my experience in administering Legal Services Programs, as to what works in strengthening what is believed to be weak programs, largely dealing with the size of the staff, the location of the staff, staffing patterns, the ability of programs to specialize.

He never visited MLSO personally, although a member of his staff did, but this was after he made his recommendation.

He further testified that he "did have an understanding of the probabilities of the merged program becoming a more effective program than what we had. * * *" (T–76).

He was advised that the State had found that there was a case load problem, that is, that MLSO was taking on too many new problems without settling old ones.

With regard to the June, 1970, evaluation, he stated (T–78):

I did read it and I did talk to her and to the other evaluator. I was concerned about the inflammatory nature of the circumstances surrounding that evaluation report and agreed with the decision that another evaluation was necessary.

There exists no written feasibility study regarding the merger of the OCLSO and the MCLSO. The discussions between the members of the staff of the OEO Legal Services Division and various of its evaluators which led to the decision to merge the two LSO's were never reduced to writing. (See OEO letter—Ex. P–9).

The Auerbach Report reinforced his position, according to Mr. Gearan, "that the program had programmatic deficiencies and * * * administratively it would have been wiser and it would strengthen the program in Monmouth County to merge it with what we considered a program that was becoming quite a bit stronger in Ocean County." (T–85). Parenthetically, the Auerbach Report also covers Ocean County and renders no support for the conclusion that the Ocean County program was "becoming quite a bit stronger".

The Auerbach Report, it is noted, did not recommend a merger. Mr. Gearan's response to this was "the Auerbach people are not the people who have to come

---

1. (T) refers to transcript of August 24, 1971 on the application for a preliminary injunction. The number refers to page of transcript.

up with the money for their recommendations and our Region was running at that time on the same amount of money it had the year before." (T–86).

At still another point in his discourse on why he recommended against continuing MLSO as a separate Legal Services Organization, Mr. Gearan stated that his recommendation "was based * * * on what the State office had done, working extensively in the field with the program, having visited the program extensively, recognizing the limitations of our staff time, having so many projects to deal with, with so many dollars to administer and monitor, that we did rely heavily on a State office that we considered to be highly competent, and the State office did spend a lot of time in the field." (T–87).

At the conclusion of the first day's hearing this Court directed government counsel to produce the OEO file at the next day of hearings, as follows (T–90):

> I want to see it because there are some scurrilities in that file and if they tainted in any way the determination that was made here administratively, in my judgment it severely impeaches the validity of the administrative determination. There are scurrilities directed at highly placed figures in the legal profession in Monmouth County. * * * that this Monmouth County Legal Services was under the domination of one particular lawyer, who happens to be one of the outstanding members of the Bar of this State, and if this is the kind of thing that is going on administratively within our national government then there is only one thing to do, and that is to bring it out into the open.

The balance of the record of this proceeding reflects credit upon MLSO and its people as they did their day-to-day work to aid the poor and minority groups in Monmouth County. Their effectiveness is dramatized by the major effort played in stilling the Asbury Park riot. Unfortunately, the record is not as kind to OEO. Mirrored are outcroppings of bureaucratic bungling, administrative arrogance, imposition of punitive sanctions *ex post facto*, and, generally, an attitude of disdain for "working within the system."

## DISCUSSION

As will hereinafter appear, I am obliged by law to uphold the defendant's opposition to plaintiffs' motion. *See* "Legal Issues", *infra*. However, before doing so, I find it in order to set forth certain views I have come to regretfully but necessarily.

Disturbing here is the intrusion and influence of individual philosophical concepts—political, economic, and social—upon the evaluations and recommendations made by OEO personnel. They were offended, it is clear, by alleged shortcomings of MLSO in the field of "law reform and community action." Yet these abstractions and undefined objectives, whatever they may mean (and the meaning varied with the evaluator), were never reviewed with MLSO until after the decision was made to merge MLSO out of existence. For example, the Director of MLSO was told that these terms included rent strikes—but not until the evaluation in June, 1970.

Even more serious is the flagrant disregard by OEO of its own regulations. Thus, 45 C.F.R. § 1061.2–5 provides:

> When making on-site evaluations * * * OEO officers should arrange, whenever reasonably possible, to consult representatives of the State and local bar associations. The views they express should be recorded in reports of such evaluations and such views will be duly considered in making decisions affecting the programs evaluated.

Had such consultations been sought (and it is clear they were not), and the views "duly considered" which were obtained, they would have been highly persuasive to any reasonable person that MLSO was functioning well. The moving papers include affidavits of leading members of the Bench and Bar of Monmouth County laudatory of the performance of MLSO.

The insensitive treatment afforded MLSO and its dedicated staff is dramatized and intensified by the insolence of highly placed OEO figures toward the judicial process as represented by this Court.

It is important to remember that we are dealing here with an agency charged with developing a program of legal services for the poor, to the end that they will be brought into the mainstream of our legal system, will respect our governmental institutions, and will recognize that justice is for all, not just the affluent. OEO in its *Guidelines for Legal Services Programs* cautions all who are working within its program (Ex. P–13 at p. 3):

> Needless to say, attorneys directing or employed in a legal services program must ensure that the conduct of the program conforms to the Canons of Professional Ethics and Rules of Professional Conduct of lawyers. * *

One would, against this background, be entitled to demand that the personnel of OEO be exemplars of impeccable professional conduct for the Bar, to demonstrate that our legal system and all its parts are entitled to the greatest deference and respect. In the instant challenge to its decision, OEO had the opportunity to dramatize such a philosophy, to show in court, conclusively and beyond doubt, that its decision was fully considered, well within agency discretion, and based solidly upon sound legal conclusions drawn from established facts. It rejected this opportunity. Instead it contemptuously elected to deprive the plaintiffs and this Court of the full record of agency action. Unbelievably, it withdrew from the stand a witness whose cross examination was not completed; then underscored its contempt for this Court by failing to produce the decision-maker, Mr. Dietrich, to respond to cross examination, after having been requested by this Court to do so. That its position on this motion must be sustained does not justify its course thus pursued.

This Court is in complete accord with President Nixon who, in his message to Congress on May 5, 1971, dealing with the establishment of an independent Legal Services Corporation, stated that legal services for the poor must become "a permanent part of our system of justice." (*See* Statement by Frank Carlucci, Director, Office of Economic Opportunity, June 30, 1971, Ex. P–6). This Court also agrees with the statement by Mr. Carlucci that "it is not unrealistic to plan for universal legal services for poor people". (Id.). Moreover, I have been impressed by the commitment of the young lawyers who have been before this Court in LSO matters, men who have been willing to forego the benefits of private practice because of their belief in the rights of the poor.

Yet, what is gained by these noble concepts and goals, by the carrying of the benefits of our system into the ghettos, if, under circumstances confronting us here, top administrators fail the crucial test: by showing their own lack of respect for now well settled doctrines within our legal system? One of the staff members of MLSO put it this way in exposing the harm done by OEO on this project (Ex. P–5, pp. 77–86):

> We're back in the same position, black-white government, where government is telling us what needs to be done. * * * We're being the whipping boy to help develop a reasonable program down in Ocean County because the evaluation says there is none. * * * We are opposed to merger on the basis of the fact that it's not going to be any benefit to the poor people of our community. * * * I think it's unfair to us in Monmouth legal services to come and tell us we're going to take your money away because you don't like our program without having come down to see it. * * * I can see no reason under the sun how this regional office can come down to us and say, you are out of business. Because if you do that, we have got to go out and tell the black communi-

ties, here again, when it looks like there might be an opportunity for us to get a benefit, it's all down the wash drain and we're going to play the game of changing chairs again. * *

And so the picture was clearly drawn for all to see. Plaintiffs came to court because they believed not only that the merger decision was wrong. More importantly, they strongly felt that it had not been properly considered; and that they had been dealt with unfairly. OEO now had through the judicial process a second chance to fortify its overall program and the supposed underlying philosophy of support of our legal institutions. Its staff rejected it. One can hardly blame the plaintiffs if they are unable to comprehend the cavalier handling by OEO of this entire matter.

If the foregoing chastisement of OEO seems severe, it was intended to be so. Great programs can be destroyed by little people. As Mr. Carlucci himself has said (Id.):

It is imperative that in our efforts to construct and perfect a program to vindicate the rights of the poor we maintain a perspective on the overall goals of society and attempt to build into the program measures to achieve judgment which will insure attainment of those goals. It little services the interests of the poor to establish an elaborate program that cannot last because of its conflicts with such goals.

OEO by its sorry performance both administratively, and in this proceeding, has done little to advance the confidence of the poor in our legal system. The impoverished of Monmouth County, as represented by the plaintiffs, can draw no good example from OEO's procedures, culminating in withholding from plaintiffs important evidence, documentary and testimonial, all because apparently, OEO believes that it has in this field of its Legal Services Program absolute, unchecked, and unreviewable discretion. The significance of what has occurred goes far beyond the narrow issues of this case and is underscored by the fact that there is now before the Congress legisla-

tion which would, if approved, define the federal role in legal services for many years to come, in setting up an independent legal services corporation. The legislative branch may wish to consider broadening the scope of judicial review in this area of administrative action.

## THE LEGAL ISSUES

### Judicial Review

■ Defendant argues that there can be no judicial review of his action in the context of the circumstances of this case. I disagree.

5 U.S.C. § 702 provides:

A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

In the instant case, plaintiffs allege by verified complaint that they are suffering and will continue to suffer irreparable harm and damage because of the action taken by the OEO and its Director. Plaintiffs further allege that this action is arbitrary and capricious. Clearly there is thus afforded some measure of judicial review, limited though it may be.

Defendant contends that § 702 notwithstanding, no judicial review is available since § 701 of Title 5, U.S.C. provides that judicial review as required by § 702 does not apply "to the extent that * * * (2) agency action is committed to agency discretion by law." One reads the legislative fabric of the Act in vain for any such restriction on judicial review. That being so, the action taken by OEO is reviewable, if only to a limited degree. See Fekete v. United States Steel Corp., 424 F.2d 331, 334–335 (3 Cir. 1970) where the Court of Appeals of this Circuit stated:

We begin with the well-established principle, only recently reiterated by the Supreme Court, that "[t]here is no presumption against judicial review and in favor of administrative absolutism (see Abbott Laboratories v. Gard-

ner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–1511, 18 L.Ed.2d 681), unless that purpose is fairly discernible in the statutory scheme." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184. "Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated." Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

*Due Process—What kind of "Hearing" Was Required?*

■ Resolution of this question depends in turn upon answer to another, did OEO "terminate" MLSO (42 U.S.C. § 2944(3)) or deny its application for refunding (42 U.S.C. § 2944(2))?

The applicable procedures for affording an aggrieved party a "hearing" where there has been "termination" are set forth in 45 C.F.R. § 1067–1. A full and fair hearing is required, which would of course include the taking of evidence and affording an opportunity to cross examine witnesses, etc. It is undisputed that plaintiffs were not afforded a "hearing" of this nature.

Instead OEO acted to afford MLSO "reasonable notice and opportunity to show cause why such action should not be taken. * * *" This is required by the aforementioned statute and regulation where there is a denial of refunding. 42 U.S.C. § 2944(2) and 45 C.F.R. § 1067.2. Plaintiffs concede that they were given this "show cause" opportunity but argue that they were instead entitled to a full and fair hearing since what took place was a "termination."

As I have tried to make clear earlier, OEO, in my judgment, handled the entire matter imprudently and with insensitivity. Nonetheless, I am constrained to hold that technically the OEO action was a denial of refunding and not a termination, and, accordingly, that OEO acted in conformity with appropriate statutory and regulatory provisions. Refunding is on an annual basis, with a fiscal year

ending August 31, 1971. A new application for refunding had to be made for the next fiscal year. It would have been this which would have been rejected if it had been made.

Nor is there here a Due Process requirement which would make OEO's conduct constitutionally impermissible. As stated by Circuit Judge Van Dusen in O'Mara v. Zebrowski, 447 F.2d 1085 (3 Cir. 1971), quoting from Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971):

> * * * A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case. Thus, procedures adequate to determine a welfare claim may not suffice to try a felony charge. * * *

The "hearing" must be "appropriate to the nature of the case." Mullane v. Central Hanover Bank & Tr. Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See also*, Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); and Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970):

> * * * [the] extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss". * * * Accordingly * * * "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

Thus, I am constrained to find that under the circumstances of this case a full and fair hearing with all that is thus implied was not constitutionally required. *See* Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960):

> * * * when governmental action does not partake of an adjudication, as for example, when a general fact-find-

ing investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.

To the same effect are Cafeteria & Restaurant Workers Union, Local 473, A. F. L.–C. I. O. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Kendler v. Wirtz, 388 F.2d 381 (3 Cir. 1968).

It follows that plaintiffs were afforded that which was required by statute and regulation, and constitutionally they were entitled to no more.

The fact that there was literal compliance with "hearing" and Due Process requirements, as I have determined, does not in any way mitigate the force of my criticism, earlier expressed, of the procedures pursued by OEO.

*Availability of Injunctive Relief Preliminarily*

■ It is axiomatic that at issue here is not whether this Court believes OEO to have acted unwisely, or that this Court may have made a different determination. To prevail ultimately plaintiffs must show that there was no basis for the administrative decision, that it was an abuse of discretion, that it was unsupported by the evidence. Thus this Court cannot substitute its own judgment for that of the agency. To be entitled to an injunction preliminarily, plaintiffs must establish a likelihood of success at final hearing and irreparable injury if no preliminary injunction is granted. A. L. K. Corporation v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3 Cir. 1971).

■ Against this background of equitable principles, it is clear that plaintiffs at this point in time are not entitled to injunctive relief, given the limited scope of judicial review available.

While the Dietrich and Duggan affidavits have been stricken, there still is in the record the testimony of Mr. Gearan, who made the recommendation which led to the decision taken by Mr. Dietrich. There is also before me, as evidence produced by plaintiffs, the letters written by Mr. Dietrich and Mr. Gearan which set forth the reasons for the decision taken. Moreover, the criticism of the MLSO operation made by OEO is backed to some degree by the State in the form of Mr. Bianchi's letter to MLSO, and Mr. Bianchi's testimony; and Mr. Grearan testified he relied upon information conveyed to him by Mr. Bianchi. Quite aside from the question of MLSO's operations, however, as to which there is copious testimony and documentation to contradict the OEO position there is to be found in the record, as an element which entered into the decision-making process, the matter of budgetary considerations. Here I obviously must give great weight to the administrator. His statement that he is compelled to reduce programs or merge them in order to conform to more stringent budget limitations cannot lightly be disregarded by a court. *See* Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

It is at least arguable that the evidence in the record therefore may support the administrative decision made. In any event, pending a full hearing, I am not able to say that plaintiffs at this juncture have demonstrated that which they must in order to be entitled to a preliminary injunction.

While I have not dealt with the question of standing, I simply point out at this time that should this matter move further, there will come a time when the standing of the various plaintiffs to sue should be evaluated.

For the reasons hereinabove set forth, the plaintiffs' application for a preliminary injunction must be denied; and it is so ordered this 31st day of August, 1971.