**SIERRA CLUB et al., Plaintiffs,**

v.

**RUCKELSHAUS, Defendant.**

**Civ. A. No. 1031–72.**

United States District Court, District of Columbia.

June 2, 1972.

Bruce J. Terris, Washington, D. C., for plaintiffs.

Joseph Hannon, Asst. U. S. Atty., Harold H. Titus, Jr., U. S. Atty., James Walpole, Department of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Initially, this matter came before the Court on plaintiffs' motion for temporary restraining order wherein they sought to enjoin the Administrator of the Environmental Protection Agency from approving certain portions of state air pollution control plans—implementing the national primary and secondary standards—which had been submitted to the Administrator pursuant to Section 110 of the Clean Air Act of 1970. 42 U.S.C. § 1857c–5 (1970). Having been informed that the Administrator would not be approving the plans until May 31, 1972, we denied the motion for temporary restraining order and scheduled a hearing on the preliminary injunction for May 30. At the conclusion of the May 30 hearing, having considered the pleadings and memoranda and the arguments of counsel, we announced our findings and conclusions and granted plaintiffs' motion for preliminary injunction. We now set down those findings and conclusions in memorandum form.

### Standing

Although the Administrator does not question plaintiffs' standing to bring this action, it is clear to us that under the allegations of the complaint each of the four environmental groups who are parties-plaintiff has the requisite standing, even under the limitation expressed in the most recent Supreme Court case on the subject, Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

### Jurisdiction

■ The Administrator challenges the jurisdiction of this Court to hear this case on the theory that the plaintiffs should wait until the Administrator approves the plans and then appeal the approval under 42 U.S.C. § 1857h–5. We disagree. It is our judgment that plaintiffs have the right to bring the action in this Court at this juncture under 42 U.S.C. § 1857h–2(a) which provides in pertinent part that

"any person may commence a civil action on his own behalf—

\*　　\*　　\*　　\*　　\*　　\*

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, . . . to order the Administrator to perform such act or duty, as the case may be."

The Administrator, in recent testimony before Congress, indicated that he had declined to require state implementation plans to provide against significant deterioration of the existing clear air areas—i. e., areas with levels of pollution lower than the secondary standard —because he believed that he lacked the power to act otherwise. Unpublished transcript of Hearings Before the Subcomm. on Public Health and the Environment of the House Comm. on Interstate and Foreign Commerce, 92d Cong., 2d Sess., at 351–52 (remarks delivered on Jan. 27–28, 1972).

Previously, the Administrator had promulgated a regulation permitting states to submit plans which would allow clean air areas to be degraded, so long as the plans were merely "adequate to prevent such ambient pollution levels from exceeding such secondary standard." 40 C.F.R. § 51.12(b) (1972).

Plaintiffs' claim that the Administrator's interpretation of the extent of his authority is clearly erroneous and that his declination to assert his authority, evidenced in his remarks before Congress and his promulgation of a regulation that is contrary to the Clean Air Act, amounts to a failure to perform a non-discretionary act or duty.

It would appear that such an allegation is precisely the type of claim which Congress, through 52 U.S.C. § 1857h–2 (a), intended interested citizens to raise in the district courts. In view of this clear jurisdictional~ grant, the Ad-

ministrator's assertion that plaintiffs should await his approval of the state plans (formulated, in part, pursuant to his allegedly illegal regulation) and then proceed to appeal his approval under 42 U.S.C. § 1857h–5 is, in our opinion, untenable.

In discussing the merits of the present action—i. e., the extent of the Administrator's authority and the validity of the questioned regulation—we turn to the stated purpose of the Clean Air Act of 1970, the available legislative history of the Act and its predecessor, and the administrative interpretation of the Act.

### Purpose of the Act

In Section 101(b) of the Clean Air Act, Congress states four basic purposes of the Act, the first of which is

"to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 1857(b) (1).

On its face, this language would appear to declare Congress' intent to improve the quality of the nation's air and to prevent deterioration of that air quality, no matter how presently pure that quality in some sections of the country happens to be.

### Legislative History

The "protect and enhance" language of the Clean Air Act of 1970 stems directly from the predecessor Air Quality Act of 1967, 81 Stat. 485. The Senate Report underlying the 1967 Act makes it clear that all areas of the country were to come under the protection of the Act. S.Rep. No. 403, 90th Cong., 1st Sess. 2–3 (1967).

The administrative guidelines promulgated by the National Air Pollution Control Administration (NAPCA) of the Department of Health, Education and Welfare (HEW), which at that time had the responsibility of carrying out the directives of the Air Quality Act of 1967, point up the significance of the "protect and enhance" language as follows:

"[A]n explicit purpose of the Act is 'to *protect* and *enhance* the quality of the Nation's air resources' (emphasis added). Air quality standards which, even if fully implemented, would result in significant deterioration of air quality in any substantial portion of an air quality region clearly would conflict with this expressed purpose of the law." National Air Pollution Control Administration, U. S. Dept. of HEW, Guidelines for the Development of Air Quality Standards and Implementation Plans, Part I § 1.51, p. 7 (1969).

Turning now to the legislative history of the 1970 Act, we note at the outset that both Secretary Finch and Under Secretary Veneman of HEW testified before Congress that neither the 1967 Act nor the proposed Act would permit the quality of air to be degraded. Hearings on Air Pollution Before the Subcomm. on Air and Water Pollution of the Senate Public Works Comm., 91st Cong., 2d Sess., at 132–33, 143 (1970); Hearings on Air Pollution and Solid Waste Recycling Before the Subcomm. on Public Health and Welfare of the House Interstate and Foreign Commerce Comm., 91st Cong., 2d Sess., at 280, 287 (1970).

More important, of course, is the language of the Senate Report accompanying the bill which became the Clean Air Act of 1970. The Senate Report, in pertinent part, states:

"In areas where current air pollution levels are already equal to or better than the air quality goals, the Secretary shall not approve any implementation plan which does not provide, to the maximum extent practicable, for the continued maintenance of such ambient air quality." S.Rep.No. 1196, 91st Cong., 2d Sess., at 2 (1970).

The House Report, although not as clear, does not appear to contradict the Senate Report. *See* H.Rep. No. 1146, 91st Cong., 2d Sess., at 1, 2 and 5 (1970), U.S.Code Cong. & Admin.News 1970, p. 5356.

### Administrative Interpretation

As we noted under our discussion of the legislative history of the 1967 Act, the 1969 guidelines promulgated by

HEW's NAPCA emphasized that significant deterioration of air quality in any region would subvert the "protect and enhance" language of the 1967 Act. We also pointed out that Secretary Finch and Under Secretary Veneman applied this same administrative interpretation to the very same language found in the proposed 1970 Act.

On the other hand, the present Administrator, in remarks made in January and February of 1972 before certain House and Senate Subcommittees, has taken the position that the 1970 Act allows degradation of clean air areas. Several Congressional leaders voiced their strong disagreement with the Administrator's interpretation. Unpublished transcript of Hearings Before the Subcomm. on Public Health and the Environment of the House Comm. on Interstate and Foreign Commerce, 92d Cong., 2d Sess., at 352 (remarks of Congressman Paul Rogers, Chairman of the Subcommittee); Unpublished transcript of Hearings Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 92d Cong., 2d Sess. at 33–34, 260 et seq. (remarks of Senator Thomas Eagleton, Vice-Chairman of the Subcommittee, presiding over the hearings at the time).

The Administrator's interpretation of the 1970 Act, as disclosed in his current regulations, appears to be self-contradictory. On the one hand, 40 C.F.R. § 50.2 (c) (1970) provides:

"The promulgation of national primary and secondary air quality standards shall not be considered in any manner to allow significant deterioration of existing air quality in any portion of any State."

Yet, in 40 C.F.R. § 51.12(b), he states:

"In any region where measured or estimated ambient levels of a pollutant are below the levels specified by an applicable secondary standard, the State implementation plan shall set forth a control strategy which shall be adequate to prevent such ambient pollution levels from exceeding such secondary standard."

The former regulation appears to reflect a policy of nondegradation of clean air but the latter mirrors the Administrator's doubts as to his authority to impose such a policy upon the states in their implementation plans. In our view, these regulations are irreconcilable and they demonstrate the weakness of the Administrator's position in this case.

### Initial Conclusions

■ Having considered the stated purpose of the Clean Air Act of 1970, the legislative history of the Act and its predecessor, and the past and present administrative interpretation of the Acts, it is our judgment that the Clean Air Act of 1970 is based in important part on a policy of non-degradation of existing clean air and that 40 C.F.R. § 51.12(b), in permitting the states to submit plans which allow pollution levels of clean air to rise to the secondary standard level of pollution, is contrary to the legislative policy of the Act and is, therefore, invalid. Accordingly, we hold that plaintiffs have made out a claim for relief.

### Injunctive Relief

■ Whether this Court may properly grant injunctive relief depends on whether the plaintiffs have met the four criteria set forth in Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958) and such later authorities as A Quaker Action Group, v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969).

First, have the plaintiffs made a strong showing that they are likely to prevail on the merits? It appears to us, from our foregoing discussion, that the plaintiffs have made such a showing in this case.

Second, have the plaintiffs shown that without such relief they would suffer irreparable injury? In view of the nature and extent of the air pollution problem, once degradation is permitted the range of resulting damages could well have irreversible effects. Thus, we hold that plaintiffs have made the requisite showing of irreparable injury.

Third, will the issuance of a stay cause any significant harm or inconvenience to the Administrator or other parties interested in the proceedings? We are persuaded that no substantial harm or inconvenience will result from our order granting the preliminary injunction. The order is a very limited one. It was submitted by plaintiffs' counsel after consultation with counsel for the Administrator and, in our view, it provides the Administrator with sufficient time and flexibility so that he may exercise his expertise and carry out his duties under the Act with as little inconvenience as possible.

Fourth, and finally, where lies the public interest? It seems to us that the public interest in this case strongly supports the legislative policy of clean air and the non-degradation of areas in which clean air exists.

### Conclusion

Having separately considered the four criteria for injunctive relief, and having found that plaintiffs have met each of these criteria, we conclude that we can and should grant the requested relief.