The **CITY OF HIGHLAND PARK,** a Home Rule municipal corporation, et al., Plaintiffs,

Village of Deerfield, Additional-plaintiff, 1-3-74,

v.

**Russell E. TRAIN,** as Administrator of the United States Environmental Protection Agency, et al., Defendants.

No. 73 C 3027.

United States District Court, N. D. Illinois, E. D.

March 15, 1974.

Supplemental Opinion March 25, 1974.

Joseph V. Karaganis, Sanford R. Gail, Martin, Karaganis & Gail, Thomas H. Compere, Berle L. Schwartz, Highland Park, Ill., for plaintiffs.

Bernard Carey, State's Atty., Fredric B. Weinstein, Melvyn A. Rieff, Asst. State's Atty., for Highway Dept.

John C. Christie, Jr., John P. Scotellaro, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for Lord & Taylor.

Frederic O. Floberg, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for Village of Northbrook.

Richard V. Houpt, Sheldon Davidson, Pedersen & Houpt, Chicago, Ill., for Village of Deerfield.

U. S. Atty. James R. Thompson, Floyd Babbitt and David R. Sturges, Asst. U. S. Attys., for U. S. Environmental Protection Agency and the U. S. Dept. of Transportation and Russell E. Train, Administrator of the U. S. Environmental Protection Agency.

Arnstein, Gluck, Weitzenfeld & Minow, Burton Y. Weitzenfeld, Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Homart Development Co., Broad-way Properties & Sears, Roebuck Co.

## MEMORANDUM OPINION

DECKER, District Judge.

In this multi-count action, plaintiffs assert that they have been denied, or are in imminent danger of being denied, various federal Constitutional and statutory rights through the action and inaction of various federal, county and private defendants. In general, the primary impetus for this lawsuit is the alleged violation by federal officials and agencies of their duties under the Clean Air Act, as amended, 42 U.S.C. § 1857 et seq., and the National Environmental Protection Act, 42 U.S.C. § 4321 et seq., by failing to subject a particular highway expansion project and an adjacent shopping center complex to the requirements of those statutes. Plaintiffs seek declaratory and injunctive relief ordering the governmental defendants to take action to meet their statutory obligations and prohibiting further construction of the road expansion or shopping center in the interim.

Plaintiffs consist of the cities of Highland Park and Deerfield, municipal corporations in the immediate area of the shopping center site; the Tri-Suburban Defense Counsel, a non-profit Illinois corporation, whose membership includes residents of Highland Park, Deerfield and Northbrook interested in protecting the physical and aesthetic environment of those cities; and various residents of Highland Park and Glenbrook Countryside. The individual plaintiffs live immediately north or west of the shopping center construction site.

In December, 1973, a hearing was held on plaintiffs' motion for a preliminary injunction and on defendants' motions to dismiss for lack of subject matter jurisdiction, or, in the alternative, for failure to state a claim upon which relief could be granted. The parties having exhaustively briefed the issues raised at the hearing, the matter is presently before the court for a decision of those motions.

### I. Background to the Lawsuit

The facts culminating in this lawsuit, as gathered from the papers on file, are as follows: Lake-Cook Road constitutes the boundary line between Lake and Cook Counties. For most of its length, the road consists of two lanes. Starting in 1967, the Cook County Highway Department began to develop plans to expand the road to a four-lane highway and also to construct a four-lane extension where no road presently exists. Although it appears that, at that time, an

expanded Lake-Cook Road was deemed to be capable of handling projected traffic increases for the next 20 years or more, plaintiffs claim that these estimates did not foresee, nor take into account, the increment in average daily traffic that would be caused by the construction of a large shopping center complex on the Road.

In January, 1973, the defendant developers [1] submitted a proposed plan for the construction of a large shopping center on Lake-Cook Road between Skokie Highway and Waukegan Road.[2] Because of the location of the proposed site in conjunction with the Tri-State Tollway, which blocks all north-south through street access in the area except for Skokie Highway and Waukegan Road, the only main thoroughfare providing access to the shopping center will be Lake-Cook Road. Consequently, plaintiffs estimate that 90% of the traffic generated by the proposed shopping center will have to use Lake-Cook Road.[3]

Plaintiffs claim that expected traffic growth plus the increase in vehicle trips to be generated by the shopping center [4] will soon overwhelm the Lake-Cook Road expansion and will create especially acute traffic congestion at the intersections of Lake-Cook Road with Skokie Highway and Waukegan Road.

These developments allegedly will subject plaintiffs to a substantial increase in "noise and discomfort in the use of their homes and in the use of the streets in their community." More specifically, plaintiffs forecast that the increase in traffic will raise the concentration of carbon monoxide in the ambient air by more than 66% over existing levels.

## II. Counts I and II

These counts comprise the heart of this lawsuit. Here plaintiffs allege that the Administrator of the Environmental Protection Agency ("EPA") has failed to promulgate regulations in conformity with a timetable set forth in the Clean Air Act Amendments of 1970 and proposes to grant projects which begin construction prior to May 15, 1974, exemptions from that statute's regulations, also in violation of the statute.

### A. The Clean Air Act Amendments of 1970 [5]

The Clean Air Act was enacted, *inter alia*, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 1857(b)(1). The program established to control air pollution divides responsibility for the task between the states and the federal government. The Administrator of the EPA has exclusive responsibility for establishing "national ambient air quality standards," [6] while the states have primary authority, subject to EPA review, for establishing "implementation plans" to achieve these standards. In spite of the complexity and breadth of this undertaking, the Act established an expedited schedule for EPA promulgation of air quality standards, the submission of state implementation plans, and the development of substitute federal programs to replace deficient state plans.

---

1. The developers consist of Sears, Roebuck and Co., Neiman-Marcus Co., Lord and Taylor Inc., Homart Development Co., Broadway-Hale, Inc., and Northbrook Associates.

2. Plaintiffs claim that the shopping center will occupy 1,000,000 square feet and will contain four department stores, 120 smaller retail shops, banking facilities, and an auto repair center. The parking lot will hold 5,000 cars.

3. This estimate is supported by a traffic impact study of the proposed development.

4. It is estimated that 28,400 vehicle trips per day will be attributable to the shopping center.

5. The Clean Air Act was originally enacted in 1963, 77 Stat. 392, and amended in relatively minor respects three times during the following seven years. Its present form, however, derives almost entirely from the amendments adopted in 1970.

6. These are standards designating the maximum tolerable concentration in the air of substances identifiable as pollutants. See 42 U.S.C. § 1857c-4(a).

Thus, within 30 days after the passage of the Act, the Administrator was to publish proposed ambient air quality standards for each pollutant for which "air quality criteria had been issued." 42 U.S.C. § 1857c–4(a)(1)(A).[7] After a maximum of 90 days for public comment upon these proposals, the Administrator was required to issue final air quality standards. 42 U.S.C. § 1857c–4(a)(1)(B). Both of these deadlines were met by the EPA.

Within nine months after the promulgation of the national ambient air standards, each state was to submit to the Administrator a plan which provided for the "implementation, maintenance, and enforcement" of these standards. 42 U.S.C. § 1857–5(a)(1). The Administrator was to review the state plans within four months to assure that they satisfied the statutory requirements. 42 U.S.C. § 1857c–5(a)(2). Each plan was to provide for the attainment of the national primary standards "as expeditiously as possible" but in no case later than three years after the date of EPA approval of the plan. 42 U.S.C. § 1857c–5(a)(2)(A)(i). Attainment of national secondary standards was to occur with a "reasonable time" to be specified in the plan. 42 U.S.C. § 1857c–5(a)(2)(A)(ii). Further, each plan was to include "emission limitations, schedules and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls." 42 U.S.C. § 1857c–5(a)(2)(B). The Act also sets forth a number of other specific conditions required before the approval of the EPA

was to be forthcoming. If the plan or any portion thereof was determined not to satisfy the statutory conditions, the Administrator was required to disapprove the plan or portion. In such a situation, he had six months from the date of submission, or two months from the date of disapproval, to promulgate his own implementation plan, or portion, for the state involved. 42 U.S.C. § 1857c–5(c).

Prior to and during the period in which the state plans were under review by the EPA, the Administrator repeatedly expressed doubts about his authority to require state plans to protect against "significant deterioration" of existing clean air regions[8] and was on record as stating that he would not demand such provisions in state plans. See Sierra Club v. Ruckelshaus, 344 F. Supp. 253, 254 (D.C.D.C.), aff'd per curiam (D.C.Cir. 1972), aff'd by an equally divided court sub nom., Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). The Sierra Club brought suit in the U. S. District Court for the District of Columbia to enjoin the Administrator from approving any state plans omitting provisions on significant deterioration, claiming that such action would constitute a failure to perform a non-discretionary duty in violation of the Act. See 42 U.S.C. § 1857h–2(a). After examining the stated purpose of the Clean Air Act Amendments of 1970, the legislative history of the Act and its predecessor, and pertinent administrative regulations, see 344 F.Supp. at 255–256, the court held for the plaintiffs, concluding that:

> "[T]he Clean Air Act of 1970 is based in important part on a policy of non-degradation of existing clean air and

---

7. The Administrator was to establish two sets of ambient standards: (1) "primary standards," the "attainment and maintenance of which . . . are requisite to protect the public health," 42 U.S.C. § 1857c–4(b)(1); and (2) "secondary standards" "requisite to protect the public welfare from any known or anticipated adverse effects." 42 U.S.C. § 1857c–4(b)(2).

8. "Significant deterioration" is an environmental concept referring to situations where the level of pollution in a given area is lower than the secondary air quality standard but is allowed to degrade to the level of the standard.

that . . . permitting the states to submit plans which allow pollution levels of clean air to rise to the secondary standard level of pollution, is contrary to the legislative policy of the Act and is, therefore, invalid." 344 F.Supp. at 256.

The Illinois plan was duly submitted on January 31, 1972, and partial EPA approval was forthcoming on May 31, 1972, within the four-month period prescribed by the statute. However, Illinois and a number of other states were granted an extension until February 15, 1973, to submit the transportation control portions of their implementation plans. See Natural Resources Defense Council v. E.P.A., 154 U.S.App.D.C. 384, 475 F.2d 968, 970 (1973) (hereinafter referred to as *Natural Resources*).

Suit was immediately instituted in the U. S. Court of Appeals for the District of Columbia Circuit challenging these extensions, *inter alia*. *Natural Resources, supra*. The court determined that, although the Administrator had "acted in the best of faith in attempting to comply with the difficult responsibilities imposed upon him by Congress," 475 F.2d at 970, he had failed to conform to the strict time requirements of the Clean Air Act in granting the extensions with respect to the transportation control aspects of the state plans. In addition, the court found insufficient evidence in the record with respect to whether the EPA had conducted a state-by-state determination on the efficacy of the state plans to provide for maintenance of the primary and secondary standards beyond May 31, 1975.[9] In order "to remedy these violations of the Act," the court established its own time schedule under which the EPA was to review the state plans as to their maintenance provisions and to disapprove those which he determined did not contain sufficient measures. Pursuant to this re-examination, the state plans of Illinois and all other states were found to be deficient.

However, the states were granted a second opportunity to develop adequate programs. In guidelines to the states to aid them in developing these plans, the Administrator noted that several mechanisms were available to mitigate the impact of community growth on air quality maintenance. For example, maintenance could be guaranteed by then-required provisions to review the construction or modification of a stationary source of air pollution where emissions from that source would result in interference with maintenance. 40 C.F.R. § 51.18. See 39 F.R. 7270 (February 25, 1974). But the Administrator warned such measures alone would not be adequate to ensure maintenance. Accordingly, he advised that the stationary source review procedures be expanded by the states to cover "complex" or "indirect" sources of air pollution—"facilities [like the shopping center in question here] which do not themselves emit pollutants, but which attract increased motor vehicle activity and thereby may cause violations of an implementation plan's transportation control strategy or may prevent or interfere with the attainment of an ambient air quality standard." 39 F.R. 7270 (February 25, 1974). Notwithstanding these suggestions, the states failed to include adequate complex source provisions and the Administrator again was compelled to disapprove the state plans. See 38 F.R. 6290 (March 8, 1973). At the time of the institution of this suit, and pursuant to the time schedule adopted by the court in *Natural Resources*, the EPA was in the process of holding public hearings in 43 states to receive comment on complex source regulations.[10]

9. The court also found that the Administrator had violated the Act by granting extensions to mid-1977 for attainment of the national primary ambient air standards without following the statutory procedures. 42 U.S. C. § 1857c–5(e).

10. On February 14, 1974, the Administrator issued final regulations concerning indirect sources. See 39 F.R. 7270 (February 25, 1974).

### B. The Issues in Counts I and II

In Count I, plaintiffs complain of the continuing failure of the Administrator to promulgate federal implementation regulations to correct the deficiencies of the Illinois plan within the time period established by the Act. Since disapproval, rather than approval, should have occurred on May 31, 1972, and since the Act granted the Administrator two months thereafter to issue substitute implementation plans, plaintiffs assert that the Administrator has been in violation of the Act since July 31, 1972. Specifically, plaintiffs emphasize the failure of the Administrator to issue regulations to prevent the significant deterioration of air quality in areas, such as the proposed shopping center location, with air cleaner than national standards or to prevent violations of the standards by complex sources. Plaintiffs seek an order requiring the EPA to promulgate regulations addressed to those problems and halting further construction of the shopping center until the plans therefor have been reviewed by the Administrator under the foregoing regulations.

Count II asserts that the expansion of the Lake-Cook Road, "as impacted by the traffic load" to be generated by the shopping center complex, will cause significant degradation of air quality in the neighborhood and will interfere with the maintenance of air quality standards. Plaintiffs repeat their Count I prayer for a mandatory injunction upon the Administrator to issue the overdue regulations and, further, ask that the road improvement be halted until such time as the regulations are promulgated and the road project is subjected to federal review thereunder.

In response, the defendants have submitted numerous challenges to the jurisdictional bases alleged in the complaint. Each of these will be addressed in turn.

### 1. Jurisdiction Under the Clean Air Act Amendments of 1970.

Initially, defendants argue that plaintiffs are in the wrong court because the Act provides an exclusive forum in the Courts of Appeals to review allegations of the type made in this complaint. The section of the statute upon which defendants rely provides in relevant part:

> "A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day." 42 U.S.C. § 1857h–5(b)(1).

Strong arguments are presented by both parties as to the applicability of this provision to the situation at bar. Plaintiffs claim that this is not a suit to review the Administrator's action in "approving or promulgating any implementation plan" because the complaint specifically alleges that the Administrator *disapproved* the Illinois plan under the guidelines of the court in *Natural Resources*, and has not issued a substitute plan. On the other hand, the EPA and the developers argue that the suit falls within the purview of that section. In support thereof, those defendants contend that the origin of this lawsuit can be traced to the Administrator's approval of the Illinois plan on May 31, 1972, and that any regulation enacted will become part of the state plan.[11]

Courts apparently have differed in the interpretation to be given this statutory provision. Compare Utah Int'l, Inc. v. E.P.A., 478 F.2d 126, 127 (10th Cir. 1973); Anaconda Co. v. Ruckelshaus, 482 F.2d 1301, 1305 (10th Cir. 1973), with Pinkney v. Ohio Env. Prot. Ag.,

---

11. Defendants claim that plaintiffs also could have sought review of EPA approval of the Illinois transportation control plan on December 5, 1973.

375 F.Supp. 305 (N.D.Ohio, 1974). *Pinkney* is the only case on point. In that case, plaintiffs also challenged the action of the Administrator in delaying the effective date of federal regulations with respect to indirect sources. The court deemed this aspect of the suit to constitute a petition for review of administrative action in promulgating regulations and, thus, within the exclusive jurisdiction of the court of appeals.[12]

To the extent that judicial interpretations of 42 U.S.C. § 1857h–5(b)(1) are irreconcilable, this court need not choose among them, for, even assuming that this action is cognizable in this court, plaintiffs are barred from this forum for failing to observe the Act's procedural requisites for filing suits in district court.

The Act provides for district court jurisdiction of civil suits challenging certain actions of the Administrator. The relevant language provides:

"[A]ny person may commence a civil action on his own behalf—

. . . . . .

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty . . . which is not discretionary with the Administrator." 42 U.S.C. § 1857h–2(a).

However, certain limitations are imposed upon this right to sue:

"No action may be commenced—

. . . . . .

(2) under [the foregoing provision] prior to 60 days after the plaintiff has given notice of such action to the Administrator . . ." 42 U.S. C. § 1857h–2(b).[13]

Plaintiffs acknowledge that this action was instituted without according 60 days notice to the Administrator. However, in an apparent attempt to overcome this omission, plaintiffs have stated that they would not rely upon the citizen suit provision of 42 U.S.C. § 1857h–2 until the expiration of 60 days from the filing of the complaint. This strategy is based upon the decision in Riverside v. Ruckelshaus, 4 E.R.C. 1728 (C.D.Cal.1972). The court there held that personal service upon the Administrator together with a lapse of 60 days between the date of filing and the date of completion of a hearing on plaintiffs' request for a preliminary injunction amounted to sufficient constructive compliance with the notice provision so as to give the court jurisdiction under 42 U. S.C. § 1857h–2.

Such an approach to the notice provision constitutes, in effect, judicial amendment in abrogation of explicit, unconditional statutory language and this court respectively declines so to ignore or to modify the notice requirement.

▮ Not only is strict adherence mandated by the statute, it is supported by compelling practical and policy considerations, especially in cases of a complex nature such as the one before the court. Congress was aware of the 60 days granted the United States, or an officer or employee thereof, to answer complaints in civil suits under Rule 12(a), F.R.C.P., when it incorporated the notice provision into the Clean Air Act. Had the drafters of the Act considered the Rule 12 period alone to be sufficient, they would not also have required notice prior to commencement of the suit. During the 60-day period,

12. In Utah Int'l, Inc. v. E.P.A., *supra*, the court interpreted the clause
 "to provide for judicial review of *final* administrative action. Hence, an order approving a state plan is subject to review, for by approving a state plan, the E.P.A. thereby places the state plan into effect. However, an order disapproving a state plan is not subject to review, because by the mere act of disapproval *no* plan is placed into effect and the administrative process is simply reactivated." 478 F.2d at 127.

13. The statute granted the Administrator authority to specify the manner in which the notice is to be given. The regulations prescribing the procedures for giving notice are set forth at 36 F.R. 23386–87 (December 9, 1971).

many questions that might otherwise be presented to the court could be subject to negotiated settlement; this possibility for compromise is at least reduced by forcing the Administrator into court with abbreviated notice. Further, without the grace period, the EPA would be accorded only a few days, as here, where plaintiffs sought an immediate restraining order, to assess, and prepare a response to, a difficult, multi-count suit, seeking substantially more than mere ministerial action. In addition, complex matters might necessitate deploying attorneys from Washington. And, of course, institution of suit interrupts the on-going process of regulation development and other substantive EPA concerns. In light of these considerations, scrupulous observance of the 60-day notice provision must be required. Thus, plaintiffs' failure to meet the notice requirement is fatal to jurisdiction under 42 U.S.C. § 1857h–2. Accord: Pinkney v. Ohio Env. Prot. Ag., *supra*.

### 2. Other Jurisdictional Bases.

The foregoing discussion has precluded the explicit judicial review provisions of the Clean Air Act as bases for jurisdiction in this court. However, an apparent saving clause provides:

"Nothing in this section [referring to 42 U.S.C. § 1857h–2] shall restrict any right which any person may have under any statute or common law . . . to seek any other relief (including relief against the Administrator or a State agency)." 42 U.S.C. § 1857h–2(e).

In reliance upon that clause, plaintiffs maintain that jurisdiction exists under the following melange of statutes: (1) section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706; (2) the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; (3) the general federal question jurisdictional statute, 28 U.S.C. § 1331; and (4) 28 U.S.C. § 1361.

### (a) The Administrative Procedure Act.

A quick reading of section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, would indicate that those provisions constitute a sufficient jurisdictional base for this action. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. The Act further provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "The form of proceeding for judicial review" is controlled by "the special statutory review proceeding relevant to the subject matter in a court specified" by the particular statute; however, in the "absence or inadequacy" of that review, "any applicable form of legal action" may be brought "in a court of competent jurisdiction." 5 U.S.C. § 703.[14]

The preceding language clearly implies that, where a statute has established a review proceeding adequate to the subject matter, that proceeding is to control. In fact, courts have established a rule that where Congress has provided adequate procedures for judicial review of administrative action, that procedure must be followed. Utah Int'l, Inc. v. E. P. A., *supra* 478 F.2d at 128; Frito-Lay, Inc. v. F. T. C., 380 F.2d 8 (5th Cir. 1967); United States v. Southern Ry. Co., 364 F.2d 86 (5th Cir. 1966), cert. denied, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967). See Pinkney v. Ohio Env. Prot. Ag., *supra*. Otherwise stated,

"[i]f Congress specifically designates a forum for judicial review of administrative action, such a forum is exclusive, and this result does not depend on the use of the word 'exclusive' in the statute providing for a forum for judicial review." Getty Oil Co. v.

---

14. The APA recites actions for declaratory judgment, injunction, and habeas corpus as examples of forms of legal actions.

Ruckelshaus, 467 F.2d 349, 356 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). See Hagedorn v. Union Carbide Corp., 363 F.Supp. 1061, 1067 (N.D.W.Va. 1973).

As discussed in section *II.B.1., supra,* the Clean Air Act Amendments of 1970 contain their own jurisdictional and judicial review provisions. The Administrator may be brought into district court when he is alleged to have failed to perform a non-discretionary duty, 42 U.S.C. § 1857h–2(a)(2); and, when the Administrator is charged with improperly approving or promulgating a state plan, a petition to review may be filed in the appropriate Court of Appeals. 42 U.S.C. § 1857h–5(b). These provisions would appear to cover the entire gamut of situations where it would be necessary to challenge the Administrator.

■ In light of the rigorous manner in which the Courts of Appeals have reviewed the Administrator's actions in promulgating or approving state plans, it cannot be said that those review provisions are inadequate. See, *e. g.,* Natural Resources Defense Council v. E. P. A., 489 F.2d 390. (5th Cir. 1974). Assuming that this lawsuit is one properly to be presented to a district court, plaintiffs have forfeited their statutory right to be in this forum by neglecting to observe the 60-day notice requirement. See section *II.B.1., supra.* Any "absence or inadequacy" of the citizen suit provision is solely attributable to the plaintiffs and cannot be cured by refuge in the APA. See Pinkney v. Ohio Env. Prot. Ag., *supra.*

Accordingly, section 10 of the APA does not constitute an independent jurisdictional basis for this lawsuit.

### (b) The Declaratory Judgment Act.

■■ Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, any federal court may declare the rights and legal relationships of parties who have presented an actual case or controversy within the court's jurisdiction. How-

ever, it is well-settled that this statute is not jurisdictional; its operation is procedural only. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). See Skelly Oil Co. v. Phillips Pet. Co., 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." Skelly Oil Co. v. Phillips Pet. Co., *supra.*

■ Thus, unless plaintiffs' action is otherwise within the competence of this court, the Declaratory Judgment Act is of no help in establishing jurisdiction. See Getty Oil Co. v. Ruckelshaus, *supra* 467 F.2d at 356; Zimmerman v. United States Gov't., 422 F.2d 326, 331 n. 7 (3d Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565, reh. denied, 400 U.S. 855, 91 S.Ct. 26, 27 L.Ed.2d 93 (1970); Hagedorn v. Union Carbide Corp., *supra* 363 F.Supp. at 1068; Thompson v. Groshens, 342 F.Supp. 516, 520 n. 11 (E.D.Pa.1972); Mattingly v. Elias, 325 F.Supp. 1374, 1375 n. 3 (E.D. Pa.1971), rev'd on other grounds, 482 F.2d 526 (3d Cir. 1973).

### (c) Federal Question.

The general federal question statute, 28 U.S.C. § 1331, confers upon district courts original jurisdiction of suits arising under the Constitution, laws, or treaties of the United States. The classic case of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), set forth the analysis to be employed by the courts in determining whether allegations were sufficient to establish subject matter jurisdiction under that statute:

> "[W]here the complaint, as here, is so drawn as to seek recovery directly under the . . . laws of the United States, the federal court . . . must entertain the suit. . . . . The reason for this is that the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief . . . .

"Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [plaintiffs] could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations . . . do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction." Id. at 681–682, 66 S.Ct. at 776.

◼ Plaintiffs' allegations that the Administrator has breached a statutory duty owed to them under the Clean Air Act Amendments (*i. e.*, that he has failed to meet the statutory timetable and failed to promulgate regulations which would prevent significant degradation of air quality and prevent violations of air quality standards by indirect sources) clearly bring the complaint within the purview of the general federal question statute and require an examination of the Clean Air Act to determine whether the claims are well-founded.[15] See Wheeldin v. Wheeler, 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L. Ed.2d 605 (1964); Powell v. McCormack, 395 U.S. 486, 516, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Gautreaux v. Romney, 448 F.2d 731, 734–735 (7th Cir. 1971).

As previously noted, the court in *Natural Resources,* set up a timetable to remedy both the Administrator's failure to observe the strict time requirements of the Act and to review the state plans for adequate maintenance provisions. For all practical purposes, the statutory timetable has been replaced by that of the court, at least with respect to Illinois and the other states involved. To refer solely to the original statutory time schedule at this late date to determine the Administrator's compliance with his obligations under the Act is meaningless, for once that timetable was disregarded, and the time periods specified therein had elapsed, neither the EPA nor the states could retrieve it.

The timeliness of the Administrator's performance must now be judged against the court's schedule. It should be noted that the time periods allowed the Administrator by the court to accomplish his tasks substantially reflect the comparable periods set forth in the Act. At the time this action was instituted, the Administrator was under a duty to promulgate regulations by December 15, 1973. An extension to February 15, 1974, was subsequently obtained. Thus, as of the date of suit, the Administrator was not in breach of his responsibilities under the court mandate. Moreover, the time schedule created by the court was entirely consistent with, indeed, more stringent than, that originally set up in the statute. Under 42 U.S.C. § 1857c–5(c), the Administrator is accorded six months from "the date required for [state] submission of [a] plan (or revision thereof)" to promulgate an implementation program for those states whose plans do not meet the statutory criteria. The initial court order required submission of state plans by April 15, 1973; this date was subsequently extended to August 15, 1973. Under 42 U.S.C. § 1857c–5(c), therefore, the EPA had until February 15, 1974, to promulgate implementation plans. Thus, even under the statute, the Administrator was not delinquent, the February date being six months from "the

15. Although the Court in Bell v. Hood also noted that a suit could be dismissed on jurisdictional grounds where the federal claim is "immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," 327 U.S. at 682–683, 66 S.Ct. at 776, these exceptions to the general rule do not apply here.

date required for submission of [state] plan[s]."

This conclusion is supported by the decision of the court in Plan for Arcadia, Inc. v. Anita Associates, Civ.No.73–2480–JWC (C.D.Cal., December 12, 1973), a lawsuit, remarkably similar to the instant case. There, individual and corporate plaintiffs, whose environmental interests were similar to those of the plaintiffs here, brought suit to enjoin further construction of a shopping center ·and to compel the Administrator to formulate an implementation plan for California dealing with complex sources. The court noted that under the "new timetable" established by the court in *Natural Resources,* the time for promulgation of the requested substitute regulations had not yet elapsed. Accordingly, the action was deemed to be premature and was dismissed for failure to state a claim.

That decision is also notable for its disposition of the claims against the developers. First, the court reasoned that, since plaintiffs' only remedy under the Clean Air Act was against parties in violation of regulations promulgated thereunder, 42 U.S.C. § 1857h–2(a), and since regulations had not yet been issued, no cause of action was stated against the corporate developers. Second, plaintiffs maintained that, notwithstanding the absence of regulations controlling complex sources, the Act should be read to forbid construction of any project which would interfere with the attainment and maintenance of the national air quality standards. The court properly rejected this argument, noting that the Act merely provided for the promulgation of implementation plans and the establishment of standards of performance.

■ In light of the foregoing, plaintiffs' complaint, insofar as it is based upon 28 U.S.C. § 1331, must be dismissed for failure to state a claim upon which relief can be granted.

*(d) 28 U.S.C. § 1361.*

The passage of 28 U.S.C. § 1361 in 1962 enlarged the jurisdiction of the district courts. The courts were granted "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In light of the assertions in the complaint, and the language of 28 U.S.C. § 1361, that provision must be deemed to establish jurisdiction in this court to review plaintiffs' claims.

■ However, this statute, and its companion venue provision, 28 U.S.C. § 1391, "were designed· [only] to eliminate obstacles to bringing mandamus actions outside of the District of Columbia and were not meant to alter the traditionally limited nature of the [mandamus] writ." Davis v. Shultz, 453 F.2d 497, 502 (3d Cir. 1971). See Jarrett v. Resor, 426 F.2d 213, 216 (9th Cir. 1970); Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969). Courts have long viewed mandamus as an extraordinary remedy, to be granted only in the most clear and compelling circumstances. Carter v. Seamans, *supra.* The rigid principles generally recognized as controlling the issuance of the writ were concisely stated by the court in Carter v. Seamans, *supra,* as follows:

"(1) a clear right in the plaintiff to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available."

■ This court has previously determined that the complaint must be dismissed under 28 U.S.C. § 1331 for failure to state a claim under the Clean Air Act for which relief could be granted. In this situation, plaintiffs do not have a "clear right" to the relief sought and the defendants are under no "clear duty" to perform the act in question. Accordingly, relief will not lie under 28 U.S.C. § 1361.

### 3. Comity.

■ Assuming, however, that this court has subject matter jurisdiction and that these counts state a claim for relief, the principle of comity would compel the court to defer to the exercise of jurisdiction by the District of Columbia Circuit in *Natural Resources*.

The Supreme Court long ago explained the comity doctrine in the following terms:

> "The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity with perhaps no higher sanction than the utility which comes from concord . . . ." Covell v. Heyman, 111 U.S. 176, 182, 4 S.Ct. 355, 358, 28 L.Ed. 390 (1884), quoted in Kline v. Burke Const. Co., 260 U.S. 226, 229, 43 S.Ct. 79, 67 L.Ed. 226 (1922).

■ In situations where lawsuits present identical or substantially overlapping issues, the rule avoids decisional inconsistencies and the imposition of unnecessary burdens upon the courts by allowing the court which first acquired jurisdiction to proceed without interference. See Great Northern Ry. Co. v. National Railroad Adjust. Bd., 422 F.2d 1187, 1193 (7th Cir. 1970).

To allow this suit to go forward would lead to the very situation the doctrine of comity was intended to avert. The timetable established in *Natural Resources* was intended to replace the statutory schedule upon which plaintiffs base this action, and the regulations being developed by the EPA under the supervision of the court will embrace the previously overlooked "complex source" topics. It is clear, therefore, that the very matters which prompted this lawsuit are being dealt with in another court. There has been no complaint that the timetable in *Natural Resources* is inadequate.[16] Further, when issued, the regulations will have nationwide applicability. Finally, failure to observe the principle of comity here would set an unfortunate precedent by which the EPA could be needlessly subjected to a maze of litigation throughout the country.

Moreover, those considerations which would justify a second court in proceeding are notably absent here. For example, this is not a matter where subsequent Supreme Court review would be aided by "the interim expression of views by more than one circuit." Dellinger v. Mitchell, 143 U.S.App.D.C. 60, 442 F.2d 782, 787–788 (1971). Nor is there any purpose in seeking a "division of labor in the interest of efficiency in judicial administration." *Id.* at 788.

Indeed, in accepting jurisdiction of the several cases involved in *Natural Resources*, the District of Columbia Circuit noted the futility of requiring the suits to proceed in other jurisdictions:

> "None of these issues involve facts or laws peculiar to any one jurisdiction; rather, all concern uniform determinations of nationwide effect made by the Administrator. Requiring these cases to be prosecuted in several circuits will only lead to delay . . . where time is literally of the essence, and will needlessly tax the agency's legal resources." 475 F.2d at 970.

Accordingly, assuming the error of this court's determination that subject matter jurisdiction is lacking and that the complaint fails to state a claim upon which relief can be granted, this court would be bound by the doctrine of comity to decline to exercise its jurisdiction.

### III. Count III

■ Count III is brought against the U. S. Department of Transportation ("DOT"), its Secretary, and the Cook County Department of Highways, for DOT's alleged failure to meet its obliga-

---

16. Indeed, as noted previously, that court has generally adopted the Clean Air Act time frame.

tions under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. NEPA requires each federal agency, in carrying out its programs, to use all practicable means to assure safe, healthful, and aesthetically pleasing surroundings, and to attain the widest beneficial uses of the environment without degradation or risk to health or safety. 42 U.S.C. § 4331(b). To ensure that each federal agency gives due consideration to the values sought to be recognized in that statute, the Act imposes a review mechanism upon the agencies. Before a federal agency can take any "major Federal actions significantly affecting the quality of the human environment," it must prepare a "detailed statement" analyzing, *inter alia*, the environmental impact of the proposed undertaking. 42 U.S.C. § 4332(C). The federal activities embraced by this provision are defined to include any project financed in whole or in part by federal funds. 38 F.R. 20550 (August 1, 1973). It is on this basis that plaintiffs allege that an environmental impact statement is required for the Lake-Cook Road expansion project. No impact statement has been prepared. Accordingly, plaintiffs seek an injunction requiring preparation of the statement and barring further construction of the road in the interim.

In light of the affidavits and other material outside the pleadings which have been presented with regard to this count, the defendants' motions to dismiss will be treated as motions for summary judgment. Rule 12(c), F.R.C.P.

The record establishes that no federal funds have been used, approved, or applied for, and that the state has not even "programmed" the project as an undertaking eligible for federal funds allocated to the state.[17] See 23 U.S.C. §§ 103–106. The only conceivable relevant federal contact with the road improvement has been designation of a two-mile and adjacent ½ mile portion of the highway[18] as parts of the Federal Aid Secondary System in 1941 and 1958, respectively, long before the present expansion plans were considered.[19]

Although, in a particular case, NEPA obligations may arise prior to federal approval or disbursement of funds, see River v. Richmond Metro. Auth., 359 F. Supp. 611 (E.D.Va.1971); La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal. 1971), no court has deemed NEPA to apply to a project with such *de minimus* federal involvement. See River v. Richmond Metro. Auth., *supra*, 359 F. Supp. at 633–634. Accordingly, summary judgment for defendants will be entered on this count.

### IV. Count IV

Amended Count IV, brought against the Village of Northbrook and its Trustees, asserts an imaginative claim that these parties have deprived plaintiffs of the equal protection of the laws as guaranteed by the Fourteenth Amendment. In support of this contention, plaintiffs allege, upon information and belief, that Northbrook has "aggressively protected" the village's residential areas from commercial and industrial developments proposed in neighboring municipalities where such complexes would abut Northbrook's residential areas. Plaintiffs allege further than municipalities are required by the U. S. Constitution to exercise their zoning powers uniformly so as to prevent aesthetic, physical, and economic harm to persons residing within and without corporate limits. The Trustees' action in enacting a zoning change to permit construction of the shopping center is claimed to be in "di-

---

17. The possibility that federal funds may be applied for eventually does not of itself, and especially not without any prior federal involvement, render the project federal for purposes of NEPA. See River v. Richmond Metro. Auth., 359 F.Supp. 611, 633–634 (E. D.Va.1973).

18. This segment lies between one-half to one mile west of the shopping center.

19. This designation makes the road improvement eligible for consideration for federal funds.

rect contrast" to Northbrook's prior land use policies and to permit the eventual subjection of plaintiffs to "vast increases in noise and air pollution as well as aesthetic destruction of the quite residential character of their community." By exposing plaintiffs to these environmental hazards, while aggressively protecting Northbrook residents from intrusion of similar developments adjacent to their homes, plaintiffs contend that the Trustees have discriminated against them in violation of the Fourteenth Amendment. Plaintiffs seek a judgment declaring that Northbrook's zoning approval for the shopping center is invalid and an injunction prohibiting "future zoning approval until Northbrook demonstrates that its residents have been subjected to similar environmental assaults." Jurisdiction is asserted under 28 U.S.C. § 1331, § 1343, § 2201, and 42 U.S.C. § 1983.

 Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute," deprives another of his civil rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." The recent decision of the Supreme Court in City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), holding that municipalities are not "persons" within the meaning of 42 U.S.C. § 1983, necessitates dismissal of the Village of Northbrook as to that jurisdictional base. However, apart from the statute, plaintiffs may maintain an action for equitable relief against the municipality under the Fourteenth Amendment. See, e.g., Bennett v. Gravelle, 323 F.Supp. 203, 216–217 (D.Md.), aff'd, 451 F.2d 1011 (4th Cir. 1971), cert. dismissed, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972).[20]

 In essence, plaintiffs are challenging Northbrook's land use decision with respect to the tract of property on which the shopping center is to be built. Although that decision may be in marked contrast to the village's prior policy with respect to similar developments in abutting surrounding communities, that fact does not make out an equal protection claim. Municipalities must retain the authority to modify their policies with respect to community development, without having the burden of demonstrating that the consequences of change fall evenly upon interested parties. A contrary rule would prevent local government from reacting to changed conditions or from implementing alterations in municipal priorities. The unreasonableness of such a rule is apparent on its face.

Moreover, it appears that the plaintiffs are in no different a position than those Northbrook residents whose homes are also adjacent or are in close proximity to the proposed shopping center. By allowing the development to proceed, neither the Trustees nor the Village has "classified" groups of residents. Northbrook residents gain no special benefits over plaintiffs or any other adjacent landowners; nor will the latter suffer any special injury unlike that to be borne by Northbrook residents. To the extent that the shopping center complex will alter the character of the neighborhood or subject it to increased noise, light, and air pollution, that detriment will operate equally upon those within the area.

Accordingly, Count IV must be dismissed.

### V. Conclusion

In view of the foregoing discussion of the various counts of plaintiffs' complaint, it is clear that the entire cause must be, and hereby is, dismissed.

### SUPPLEMENTAL OPINION

This matter having come before the court on plaintiffs' motion under Rule 62(c), F.R.C.P., for an injunction pending appeal of this court's opinion and order of March 15, 1974, and the court having heard the parties in open court and denied said motion, this memoran-

---

20. Curiously, no prayer for relief is requested specifically as to these officials.

dum is intended to set forth the reasons for such denial.

 It is well-established that the following four factors must be considered in determining whether this extraordinary remedy should be granted: (1) whether petitioner has made a showing of a strong likelihood of success on the merits of the appeal, (2) whether petitioner will suffer irreparable injury wihout this relief, (3) whether issuance of a stay would cause substantial harm to other interested parties, and (4) whether the public interest supports the injunction. Virginia Petroleum Jobbers Ass'n v. F.P.C., 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

For the reasons enumerated in this court's March 15th opinion, and for the additional reasons set forth below, the court does not consider plaintiffs to have a strong probability of success on the merits, either on jurisdictional or substantive grounds.

Secondly, plaintiffs have not demonstrated that any injury emanating from denial of the injunction would be irreparable. The harm is entirely *in futuro* and even plaintiffs' expert's affidavit in support of the motion for a temporary restraining order evidenced that the expected increase in the carbon monoxide level concomitant to the shopping center would not necessarily exceed the air quality standard for that pollutant.

Thirdly, an injunction would seriously disrupt long-standing construction plans for the shopping center and road expansion. Construction is proceeding. Since no statutory duty is being violated, plaintiffs' theory for granting emergency relief, under which defendants' equities are ignored, is inapplicable.

Fourthly, in light of the foregoing, it cannot reasonably be concluded that the public interest demands the issuance of the injunction. The court is reluctant to interrupt on-going administrative procedures; certainly, it is in the interest of Illinois residents to have the EPA give full, yet expeditious, consideration to all relevant factors prior to issuance of the regulations.

Finally, plaintiffs maintain that this court erred in assuming that the order in Natural Resources Defense Council v. E.P.A., 154 U.S.App.D.C. 384, 475 F.2d 968 (1973), embraced significant degradation regulations. A review of that order shows that the state and substitute federal plans were to satisfy each requirement of 42 U.S.C. § 1857c-5(a)(2), and, thus, were to include any "measures . . . necessary to insure attainment and maintenance" of air quality standards. Since it had earlier been determined that non-degradation regulations were essential under the Clean Air Act, Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.C.D.C.), aff'd per curiam (4 E. R.C. 1815) (D.C.Cir. 1972), aff'd by an equally divided court sub nom., Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973) this court naturally concluded that significant deterioration provisions could be included within the regulations issued under the order in *Natural Resources*.

Moreover, it has not been conclusively determined that the Clean Air Act requires prevention of significant deterioration of air quality as a decision affirmed by an equally divided Supreme Court is not an authoritative determination for other cases. United States v. Pink, 315 U.S. 203, 217, 62 S.Ct. 552, 86 L.Ed. 796 (1942). A reading of 42 U.S.C. § 1857c-5(a)(2)(B) strongly indicates that protections against significant deterioration need be included only "as may be necessary" in the expert judgment of the E.P.A., a determination subject to review in the Courts of Appeals.

 In sum, therefore, this court determined that neither the law nor the facts were so clearly in plaintiffs' favor as to warrant issuance of an injunction pending appeal.