The MONTANA POWER COMPANY, a corporation, et al., Plaintiffs,

v.

ENVIRONMENTAL PROTECTION AGENCY et al., Defendants,

v.

NORTHERN CHEYENNE TRIBE, and Northern Plains Resource Council, Intervenors.

No. CV–76–136–BLG.

United States District Court, D. Montana, Billings Division.

Jan. 27, 1977.

Order to Enter Final Judgment March 28, 1977.

John L. Peterson, John W. Ross, Butte, Mont., William H. Bellingham, Billings, Mont., for plaintiffs.

Thomas A. Olson, U.S. Atty., Keith L. Burrowes, Asst. U.S. Atty., Billings, Mont., for defendants.

Bruce J. Terris, Washington, D.C., for intervenors.

## OPINION AND ORDER

BATTIN, District Judge.

Presently pending before the Court is the plaintiffs' complaint seeking injunctive and

declaratory relief. Defendant Environmental Protection Agency (EPA) has filed a motion for summary judgment. The plaintiffs resist the motion for summary judgment, urging that it should be denied because the facts have not yet been fully developed in this case.

On October 18, 1976, this Court signed an order setting a time for hearing the request for preliminary injunctive relief. The hearing was held November 10, 1976, at which time the Court heard testimony and argument concerning the complaint on file herein. At the November 10, 1976, hearing on the motion for preliminary injunction, the Northern Cheyenne Indian Tribe and the Northern Plains Resource Council sought, and were granted, leave to intervene in this action. Following the presentation of evidence, the parties were given ten (10) days from the date each received a copy of the transcript of the hearing, within which to submit further briefs on the issues presented in this case. During this time, the parties were also instructed to delineate those parts of the record which supported the respective positions. Briefs with accompanying designations of the record have been filed. The matter is now submitted for decision. I find the plaintiffs' request for declaratory relief should be granted. The motion for a preliminary injunction is denied.

*FACTS:*

In 1970, the Congress passed the Clean Air Act of 1970. 42 U.S.C. § 1857c. In 1972, the United States District Court for the District of Columbia rendered a decision in the case of *Sierra Club et al. v. Ruckelshaus,* 344 F.Supp. 253 (D.C.D.C.1972), interpreting the 1970 Clean Air Act. In that case, the plaintiffs filed a motion for a preliminary injunction to enjoin the Administrator of the EPA from approving certain portions of state air pollution control plans. The District Court held that the Clean Air Act of 1970 involved a policy of nondegradation of existing clean air and that a regulation permitting states to submit plans which allowed pollution levels to rise to secondary standards of pollution was contrary to legislative policies of the Act. Injunctive relief was granted, requiring the Agency to promulgate regulations which would prohibit the degradation of air in certain areas where the condition of the ambient air was cleaner than national ambient air standards. *Sierra Club et al. v. Ruckelshaus, supra.*

Accordingly, on July 16, 1973, the Administrator of the EPA published initial notice of proposed rule-making, setting forth four alternative plans for preventing significant deterioration of air. The Administrator solicited wide-spread public involvement in all aspects of the significant deterioration issue. 39 F.Reg. 42510 (1974). On August 27, 1974, the Administrator issued a reproposal of regulations concerning the prevention of significant deterioration; the August proposals were offered to explore all aspects of the issue. 39 F.Reg. 3100 (1974).

The regulations proposed on August 27 called for the establishment of classes of different allowable incremental increases in total suspense articulates (TSP) and sulphur dioxide ($SO^2$). By this classification scheme, areas of the country would be designated as within one of three distinct classes. Class I applied to areas in which practically any change in air quality would be considered significant. Class II applied to areas in which deterioration normally accompanying moderate, well-controlled growth would be considered insignificant. In Class III areas, it was considered that air pollution up to the national standards for ambient air would be insignificant. Initially, all areas of the country were designated Class II, with provisions for allowing the state, the Federal Government, or Indian Tribes to reclassify any area to accommodate the social, economic, and environmental needs and desires of the public within the area. The proposed location of Colstrip Units Three and Four is in a Class II area.

Implementation of the August 27th plan was to be by preconstruction review of specified source categories to determine whether these sources would violate the area standards of classification. After some amendment, the Administrator an-

nounced that the regulations would become effective January 6, 1975, and would be applicable to sources "commencing construction" on or after June 1, 1975. The final regulations were promulgated December 5, 1974 (39 F.Reg. 42510).

In June of 1975, the regulations were amended. The Administrator found the amendments necessary and to be generally minor qualifications and corrections with the intent that the modifications of the December 5th regulations would involve only minor procedural changes and no substantive requirements. 40 F.Reg. 25001 (1975).

The *Sierra Club* case, *supra*, was appealed and affirmed. *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253, affirmed *sub nom., Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). In a different case, *Sierra Club v. E. P. A.*, 176 U.S.App.D.C. 335, 540 F.2d 1114 (1976), the Circuit Court for the District of Columbia held that regulations promulgated and adopted by the EPA were valid and that it was a valid and rational policy decision that the significance of deterioration of air quality should be considered by the qualitative balancing of clean air considerations against the competing demands of economic growth, population expansion and energy development alternatives in the field. *Sierra Club v. E. P. A., supra*. The present case questions the way in which the prevention of significant deterioration regulations are interpreted.

The manner in which the regulations are now interpreted was brought about to a significant degree by the "Strelow Memoranda." These memoranda were from Roger Strelow, Assistant Administrator for Air and Waste Management in the EPA, to the Regional Administrator of the EPA. The first of these memoranda was promulgated December 12, 1975. It concerned "Guidance on How the Phrase 'Commence', as that term is used in the Regulations to Prevent Significant Deterioration, is to be Interpreted." The second memorandum was promulgated April 21, 1976, and was a clarification of the December 18th memorandum. Two factors concerning the Stre-

low memoranda are significant. First, they reflect a policy shift from the way the Agency had initially interpreted the regulations. Secondly, the Strelow memoranda go beyond the plain meaning of the regulatory language and mandate criteria not manifest in the regulations themselves.

The Montana Power Company contends that construction of Colstrip Units Three and Four commenced before June 1, 1975. Thus, the Company takes the position that a continuous program of construction for Units Three and Four commenced before that date, so those units are not subject to preconstruction review because they were grandfathered under 40 C.F.R. § 52.21(d)(1).

On November 17, 1971, the Montana Power Company, in conjunction with the Puget Sound Power & Light Company, purchased a 1,369-acre site near Colstrip, Montana, as tenants in common. The site was to be used for possible construction of an approximately 3000 megawatt coal-fired electric generating plant. During the years 1973 and 1974, Montana Power Company purchased additional land near the Yellowstone River and constructed a water intake structure designed to serve the Colstrip project including Units One and Two, and Units Three and Four. Other activities and acquisitions involving construction programs for Units Three and Four were the purchase of additional land for a surge pond designed to supply water to the Colstrip project. The surge pond was constructed in 1974. The Power Company obtained right-of-way easements for additional water pipeline and obtained some right-of-way easements for the construction of a 500 kilovolt transmission line.

Further activity in the course of planning the construction of Units Three and Four involved an agreement between the Montana Power Company, the Puget Sound Power & Light Company, and Western Energy Company to dedicate 170,000,000 tons of coal for the Colstrip Units Three and Four.

Initial planning by the Montana Power Company for Units Three and Four was commenced soon after the Colstrip generat-

ing site was acquired in 1971. The Company contracted with third parties to initiate environmental studies on the site and made agreements with other western energy companies (including Puget Sound Power & Light Company, Portland General Electric Company, and Washington Water & Power Company) to undertake and incur costs for further engineering, economic and environmental studies regarding Colstrip Units Three and Four. An agreement was entered into by the Montana Power Company and meteorologists at Montana State University for the purpose of gathering data on air quality on the Colstrip generating site. In 1973 and 1974, the Company retained a private air pollution consultant to make air pollution projections and to recommend a stack height for the Colstrip Units Three and Four.

The culmination of the initial planning stage occurred sometime in 1973 with the retention of Bechtel Power Corporation to be the architect and engineer of Colstrip Units Three and Four. In 1973, a contract to conduct transmission engineering for Colstrip Units Three and Four and the associated 500 kilovolt transmission line was entered into by the Company and Charles Main, Inc. On June 5, 1973, following the initial studies and other conferences and considerations undertaken by the Montana Power Company, an application for certification authorizing construction of Units Three and Four was made to the Montana Department of Natural Resources. Accompanying this filing, the companies submitted a non-refundable filing fee of $1,232,930. In that application, the companies requested that a certificate be issued so that construction of the new units could actually be physically commenced on or before May 1974, thus allowing plant operation by July of 1978 with Unit Three, and July 1979 with Unit Four. The companies' planning schedules proceeded on certain assumptions, not the least of which was that there would be expediency in the determination by the Department of Natural Resources concerning the construction permit. This assumption was ill-conceived. In this connection, the companies allege that they were doing everything they could to speed the acquisition of the necessary permits. On June 24, 1976, the Board of Natural Resources and Conservation of the State of Montana approved the application to construct Colstrip Units Three and Four and associated facilities and granted the applicants a certificate of environmental compatibility and public need, subject to certain conditions. Notably, this certificate was issued nearly four months after the EPA's initial determination that Units Three and Four were subject to preconstruction review.

At the time it petitioned the EPA's Region VIII Office for a ruling on the applicability of the prevention of significant deterioration regulations, Montana Power alleged that it had entered several purchase orders and contracts for equipment. These purchase orders and agreements included a letter of intent sent to the Westinghouse Corporation to purchase two turbine generators for the Colstrip Units Three and Four on June 25, 1973. A purchase order was given to Combustion Engineering, Inc., to purchase steam generators for Colstrip Units Three and Four, and a final commitment was made on February 8, 1974. Water heaters and condensers for Colstrip Units Three and Four were the subject of a purchase order given to Westinghouse in December of 1974. Montana Power asserts that their continuous program of construction on Units Three and Four was at a cost of $20,107,000, including expenditures and cancellation charges as a result of the contractual commitments the Company incurred in the years between 1971 and 1976.

Despite the effective date of the regulations questioned here, the Agency issued advisory opinions to several utility companies in the early part of 1975 on the subject of "grandfathered" sources. In at least two cases which are factually apposite to the case at hand, the Agency found the source had "commenced construction" within the meaning of the regulations.

In September of 1975, Region VIII Administrator John Greene wrote to the President of Montana Power, Mr. J. A. McEl-

wain, that it had come to the Agency's attention that Montana Power was considering construction and operation of at least one new or expanded fossil-fuel-fired steam electric plant. The letter indicated that because of the prospective size of the generating plant it was potentially subject to the EPA prevention of significant deterioration regulations, 40 C.F.R. § 52.21. The September 2nd letter from EPA then requested information from Montana Power in response to questions set forth by the Administrator. September 8, 1975, Montana Power responded to the Region VIII EPA letter by expressing surprise at the requests made in the letter of September 2nd, because, as Montana Power said:

"We have had numerous contacts and submitted substantial amounts of material to the EPA concerning the construction of fossil-fired steam electric generating plants at Colstrip, Montana." Letter of September 8, 1975, William Coldiron.

Montana Power's letter requested additional information from Mrs. W. L. Mitchell, attorney in the Enforcement Division, and agreed to fully respond to the September 2nd letter when it had received the material information from Mrs. Mitchell. At this point, there had been no determination that the Colstrip Units Three and Four were subject to preconstruction review. Nor had the Strelow Memoranda been promulgated within the Agency.

On February 3, 1976, John Ross, an attorney for the Montana Power Company, responded to the Region VIII letter of September 2. In his February 3 letter, Ross answered each question set forth by the Agency.[1] This letter from the Power Company detailed the facts set forth above in this opinion and concluded that the program of construction for Units Three and Four, including irrevocably committed costs, involved the expenditure of $20,170,000.00.

February 26, 1976, Administrator Greene, in a letter sent to Mr. John Ross, indicated

that proposed Units Three and Four of Colstrip were subject to the prevention of significant deterioration regulations preconstruction review. The letter stated that:

"Based upon the information submitted by you in response to our letter of September 2, 1975, as well as information included in your petition for a review and upon our guidelines, this letter is to advise you that the coal-fired steam electric generating unit which your company contemplates at Colstrip, Montana, will be subject to 40 CFR 52.21." Letter from John A. Greene, Region VIII Administrator, to Mr. John Ross, attorney for the Montana Power Company, February 26, 1976.

April 21, 1976, the Montana Power Company responded to the February 26th determination by the Region VIII Administrator. The Power Company objected to the February 26th determination and requested a conference on the questions raised in the September 2, 1975, letter, assuming the determination was not final. Alternatively, the Company proposed its objections if the February 26, 1976, determination by the Agency was final. The objections were that there could not be a final determination because there had been no hearing, and secondly that the letter of February 26th could not constitute a final adjudication under the Administrative Procedures Act because it did not set forth findings of fact or conclusions of law in support of that decision. The final objection the Company raised was that there was no record by which a final determination could have been made. A letter dated May 27, 1976, from Administrator Greene to Mr. Coldiron on the Montana Power Company reaffirmed and elaborated upon the Agency's position regarding its determination that Colstrip Units Three and Four were subject to the regulations. In that letter, the Administrator indicated that his Agency

"[i]nterpret 40 CFR 52.21 specifically the definition of 'commence' as ordinarily sig-

---

1. There was testimony at the hearing that the cause of the substantial delay in answering the letter of September 2nd was occasioned by the EPA's failure to provide Montana Power with the information requested in the letter of September 8, 1975.

nificant and continuous site preparation work and a permit to construct from the State Air Pollution Control Agency."

The letter further indicates that Montana Power had not received a construction permit from the state agency and that

"In view of this, the Company has been proceeding with the *investment at its own risk* in the event that the state authority to site work construct is denied." (Emphasis added.)

The Administrator summarized the February 26th decision in the following manner:

"In summary, the grounds for the final determination of February 26, 1976, were that there has been no on-site construction, that no authority to commence construction has been obtained from the State, and that there is insufficient evidence to find that Colstrip Units Three and Four should nonetheless be considered as having commenced construction. Inasmuch as the Agency has rendered a final decision in the matter, you may, of course, obtain judicial review or you may submit new or additional information for our consideration."

The May 27th decision was made with the benefit of the intra-agency Strelow Memoranda.

June 16, 1976, Montana Power submitted another letter with additional information on Units Three and Four. The letter submitted consisted of documentation relating to the EPA's Region X determination that significant deterioration regulations were not applicable to Portland Gas & Electric's Portland plant; the findings of fact and conclusions of law with regard to the Montana Board of Health & Environmental Science's determination regarding Colstrip Units Three and Four; certain testimony concerning Colstrip Units Three and Four; and further information concerning pollution emissions valuations in the Colstrip project. On June 29, 1976, in a letter to Mr. John Peterson, counsel for the Montana Power Company, Mr. Harry E. Parrish, an attorney with the Enforcement Division of the EPA, indicated that the power companies could submit additional information in response to questions which arose at the time of a "very productive meeting, on June 23, 1976." In that letter, Parrish indicated that four steps could be taken to expedite the Agency's review of any new matter submitted by the companies. These four steps included listing (1) unique site specific facilities or equipment; (2) unavoidable losses which might be suffered due to contractual obligations; (3) existence and legal parameters of alleged contractual obligations; and (4) a concise statement and explanation of "what information you consider to be new or different from that which was originally submitted in your client's letter 'Petition' of February 3rd, 1976." On July 1, 1976, the Power Company submitted a petition for reconsideration of the EPA ruling subjecting Colstrip Units Three and Four to the regulations for the prevention of significant deterioration contained in 40 CFR § 52.21. (Document No. 24, Administrative Record.)

September 10th, Attorney John Peterson requested by letter a decision on the Power Company's petition for requested reconsideration of the determination made February 26, 1976. On October 14, 1976, the Agency reaffirmed its earlier decision regarding the applicability of the prevention of significant deterioration regulations to Colstrip Units Three and Four. Thereafter, the plaintiff approached this Court for judicial review of the Agency determination, and a November 10, 1976, hearing date was set.

*JURISDICTION:*

The plaintiffs assert that jurisdiction in this case rests on three different grounds. The first jurisdictional premise urged is 5 U.S.C. §§ 701–706. Section 701 sets a limitation on the application of judicial review:

"(a) This chapter applies . . . except to the extent that—

"(1) statutes preclude judicial review; or

"(2) agency action is committed to agency discretion by law.

". . . . ."

A number of courts have held that a statute must manifest a clear congressional intent to preclude judicial review before a court can cut off a party's right to be heard under this section. *Ortego v. Weinberger*, 516 F.2d 1005 (5th Cir. 1975). The rule is judicial review of agency actions unless there is a statutory preclusion of such review. *Environmental Defense Fund, Inc. v. Hardin*, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970).

Section 702 of Title 5 U.S.C. creates the right to judicial review.

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

This section has generally been interpreted so as to provide for judicial consideration when a party is adversely affected by agency action. See *Di Costanzo v. Willard*, 165 F.Supp. 533 (D.N.Y.1958).[2]

Title 5 U.S.C. § 703 provides the form of judicial review and allows review of agency activities by

". . . actions for declaratory judgments or writs of prohibitory or mandatory injunction . . . *in a court of competent jurisdiction*." (Emphasis added.)

This statute does not extend the jurisdiction of the federal District Courts to cases not otherwise within their competence. This is so even when taken in conjunction with 28 U.S.C. § 2201, the Declaratory Judgment Act. *Getty Oil Co., Inc. v. Ruckelshaus*, 467 F.2d 349 (3rd Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256.

Title 5 U.S.C. § 704 sets forth the agency actions which are judicially reviewable. In essence, this statute requires final agency action before judicial review is proper. However, final agency action is not the sole jurisdictional condition. 5 U.S.C. § 704 provides in part:

"Agency action *made reviewable by statute and final agency action for which there is no other adequate remedy in court* are subject to judicial review." (Emphasis added.)

The emphasized portions of 5 U.S.C. § 704 are important because of a jurisdictional defect alleged to exist by the intervenors. 5 U.S.C. § 705 merely provides for relief by an agency in the interests of justice when judicial review is pending.

The final element of the plaintiffs' first jurisdictional premise is 5 U.S.C. § 706, which involves the scope of judicial review. The section provides:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the *meaning* or applicability of the terms of an agency action. The reviewing court shall—

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . ." (Emphasis added.)

This particular section of Title 5 has been construed on innumerable occasions to limit the review powers of the District Court to only those activities of an agency which are not supported by credible evidence. The Court is prohibited from substituting its judgment for that of the Agency. See *Monmouth Legal Services Organization v. Carlucci*, 330 F.Supp. 985 (D.N.J.1971).

The second jurisdictional premise put forth by the plaintiffs is the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. This Act does not confer jurisdictional powers on the Court. The remedy of declaratory relief is available only in those

---

2. The *Di Costanzo* Court was interpreting 5 U.S.C. § 1009, the predecessor statute to 5 U.S.C. § 702.

cases where jurisdiction is otherwise conferred.

> "In a case of actual controversy *within its jurisdiction* . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (Emphasis added.) 28 U.S.C. § 2201.

Unanimous case law holds that 28 U.S.C. § 2201

> " . . . does not of itself create jurisdiction; it merely adds an additional remedy where the district court already has jurisdiction to entertain the suit." *Wells v. United States*, 280 F.2d 275, 277 (9th Cir. 1960).

See also *Smith v. Grimm*, 534 F.2d 1346, 1349 (9th Cir. 1976); *Rath Packing Co. v. Becker*, 530 F.2d 1295, 1304 (9th Cir. 1975).

The Supreme Court teaches that

> " '[T]he operation of the Declaratory Judgment Act is procedural only.' *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, [57 S.Ct. 461, 81 L.Ed. 617.] Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction. When concerned as we are with the power of the inferior federal courts to entertain litigation within the restricted area to which the Constitution and Acts of Congress confine them, 'jurisdiction' means the kinds of issues which give right of entrance to federal courts. Jurisdiction in this sense was not altered by the Declaratory Judgment Act." *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1949).

Thus, jurisdiction cannot be premised on 28 U.S.C. § 2201 alone. Jurisdiction is a condition precedent to the remedy afforded by 28 U.S.C. § 2201. The same is true of 28 U.S.C. § 2202; it does not create subject matter jurisdiction where none exists but creates a particular kind of remedy where a federal District Court already has jurisdiction to entertain a suit. *Jarrett v. Resor*, 426 F.2d 213 (9th Cir. 1970).

The final jurisdictional premise that is urged by the plaintiffs is federal question jurisdiction. 28 U.S.C. § 1331. By this section, the Court is granted original jurisdiction

> " . . . of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

This action could seemingly arise under the laws of the United States, the Clean Air Act, 42 U.S.C. § 1857, *et seq.* There is no dispute over satisfying the requisite jurisdictional amount.

■ Despite the jurisdictional allegations made in the complaint, a serious jurisdictional question has been raised in a footnote in the intervenors' brief. The argument put forth by the intervenors is that federal question jurisdiction in this case is predicated on 42 U.S.C. § 1857, *et seq.* The regulations questioned in this action were issued under the Clean Air Act. The Act provides for jurisdiction in the District Courts at 42 U.S.C. § 1857h–2. This section gives the right of suit against the Administrator of EPA

> "(2) . . . where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. § 1857h–2(a)(2).

Furthermore, the next subsection of the statute specifically states that

> "(b) No action may be commenced—
>
> "(2) under subsection (a)(2) of this section *prior to 60 days* after the plaintiff has given notice of such action to the Administrator, . . . ."

(Emphasis added.) 42 U.S.C. § 1857h–2(b)(2)

There is no allegation, nor does the record reflect, that notice of this suit was given to the Administrator 60 days prior to the commencement of this action.

The argument the intervenors allege the plaintiffs are making is that EPA did not have discretion to determine that the P.S.D.

regulations apply to Colstrip Units Three and Four. Consequently, jurisdiction in this Court would be predicated on 42 U.S.C. § 1857h–2(a)(2). However, intervenors assert subject matter jurisdiction is lacking in this case because the 60-day notice requirement was not met. The intervenors' representation of the plaintiffs' argument is inaccurate. Plaintiffs argue that in the application of the prevention of significant deterioration regulations to them the Administrator abused his discretion. They do not argue that the Administrator *had no discretion.*

Intervenor urges that the jurisdictional issue in this case is

" . . . whether the 60-day notice requirement in Section 304 [42 U.S.C. § 1857h–2(b)(2)] may be avoided by simply bringing an action, which would otherwise be within Section 304, under another jurisdictional provision. [In this case, 28 U.S.C. § 1331 and 5 U.S.C. § 701.]"

A number of Courts have held that 42 U.S.C. § 1857h–2(b)(2), where applicable, is an exclusive *remedy* and that its terms, including the notice provision must be met.

One such case is the case of *City of Highland Park v. Train et al.,* 519 F.2d 681 (7th Cir. 1975). In that case, the plaintiffs sought to block the construction of a shopping center and to compel the Administrator of EPA to promulgate certain regulations under the Clean Air Act. In reaching a decision, the Seventh Circuit found that the plaintiffs' failure to comply with the 60-day notice requirements of 42 U.S.C. § 1857h–2(b)(2) precluded jurisdiction of the federal District Court to compel the promulgation of significant deterioration regulations. The Court reasoned

" . . . that the purpose of the sixty-day notice requirement was to give the Administrator time to assess and respond to difficult, multicount lawsuits, to deploy attorneys from Washington, if necessary, and to arrange for the on-going process of regulatory development and other substantive EPA concerns despite the interruption caused by a pending law-

suit." *City of Highland Park v. Train, supra* at 690.

There is an important jurisdictional distinction between the *Highland Park* case and the present action. The jurisdictional defect in *Highland Park* rested on a count of the complaint in that case, seeking to compel the promulgation of regulations by the Administrator. The promulgation of such regulations was alleged to be an affirmative duty of the Administrator. In such cases, the 60-day notice was mandatory. 42 U.S.C. § 1857h–2(a)(2); 42 U.S.C. § 1857h–2(b)(2). The present case was not commenced under 42 U.S.C. § 1857h–2(a)(2) to compel an affirmative duty of the Administrator. The complaint, in fact, challenges the Administrator's compliance with a duty in his determination that Colstrip Units Three and Four are subject to preconstruction review.

This action is not within the conditions precedent anticipated by Congress in the enactment of 42 U.S.C. § 1857h–2(b)(2). The legislative history of § 1857h–2(b)(2)

" . . . shows Congress's determination that citizen participation in the enforcement of standards and regulations under the Clean Air Act of 1970 be established. It also shows, however, that Congress intended to provide for citizens' suits in a manner that would be least likely to clog already burdened federal courts and most likely to trigger governmental action which would alleviate any need for judicial relief. It was in response to these concerns that the statutory notice provisions were included in section 304.[6] [42 U.S.C. § 1857h–2(b)(2)]." (Footnote omitted.) *City of Highland Park v. Train, supra* at 690–691.

The imposition of a jurisdictional notice requirement of 60 days in this case would exceed the congressional intent and spirit of 42 U.S.C. § 1857h–2(b)(2). The determination of the Administrator that the prevention of significant deterioration regulations are applicable to Colstrip Units Three and Four would not likely be disturbed by giving the Agency 60 days notice of a prospective law suit. Furthermore, such notice

would likely only delay the need for any judicial relief that might be available—it would not alleviate it. To construe 42 U.S.C. § 1857h–2(b)(2) as requiring 60 days notice to an agency before permitting judicial review of agency action would significantly impair the intent and function of the Administrative Procedure Act. 5 U.S.C. § 701, et seq. Title 42 U.S.C. § 1857h–2(b)(2) was enacted to provide an avenue for citizens to become actively involved in the machinery of government. It was not intended to be an obstacle to judicial review.

■ Jurisdictional authority to review the agency action in this case can be predicated on 5 U.S.C. § 701, et seq. The language of 5 U.S.C. § 704 that

"[a]gency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review. . . ." (Emphasis added.)

which precluded jurisdiction under 28 U.S.C. § 1331 in the *Highland Park* case, *supra,* does not apply here. This case is not brought under 42 U.S.C. § 1857h–2(a)(2); the holding of *Highland Park* on this question is inapposite.[3]

Several cases have held that the Administrative Procedure Act is an independent basis of jurisdiction, including a case involving the Clean Air Act. In *Oljato Chapter of Navajo Tribe v. Train,* 169 U.S.App.D.C. 195, 515 F.2d 654 (1975), the District of Columbia Circuit stated that

"[t]he other source of jurisdiction to review EPA action pertinent to this case is Section 10 of the APA, 5 U.S.C. §§ 701– 706, which this court has found to be an independent source of jurisdiction for District Court review of much agency action regardless of the amount in controversy." *Oljato Chapter of Navajo Tribe v. Train, supra* åt 658.

Although there is a split of authority concerning 5 U.S.C. §§ 701–706 as an indepen-

dent ground for jurisdiction, *Pickus v. United States Board of Parole,* 165 U.S.App.D.C. 284, 507 F.2d 1107, 1109 (1974), the Ninth Circuit rule is that jurisdiction in the District Court does exist on this basis. *Brandt v. Hickel,* 427 F.2d 53 (9th Cir. 1970).

In summary, this Court does have jurisdiction by virtue of 5 U.S.C. §§ 701–706. Thus, declaratory relief is appropriate at the Court's discretion and injunctive relief is available if the need is established. Jurisdiction is not precluded by the 60-day notice requirement of 42 U.S.C. § 1857h– 2(b)(2). It is unnecessary to determine whether jurisdiction could exist on the basis of 28 U.S.C. § 1331.

*STANDING:*

■ There is little question in this case that the plaintiffs have standing. The test to determine whether standing exists is

"[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972).

The plaintiffs here are well within the *Sierra Club* test.

Ostensibly the issue in this case is relatively simple. It is whether the activities undertaken by Montana Power Company prior to June 1, 1975, in its planning and procurement for Colstrip Units Three and Four amounted to a continuous program of construction or contracts for such a program of construction within the meaning of the regulations promulgated by the Environmental Protection Agency. However, implicit in this issue is a more complex question involving the workings of a governmental agency. That is whether an agency can take a public position which reflects certain policy considerations, and upon which the regulated industry depends, and subsequently change that position and

---

**3.** The same reasoning applies to the other cases, cited by intervenors, which challenge jurisdiction. See, *West Penn Power Co. v. Train,* 378 F.Supp. 941, 944 (W.D.Pa.1974), af-

firmed, 522 F.2d 302 (3rd Cir. 1975); *Pinkney v. Ohio Environmental Protection Agency,* 375 F.Supp. 305, 308 (N.D.Ohio 1974).

policy by virtue of intra-agency after-the-fact interpretive guidelines.

## THE STANDARD OF REVIEW :

 The mandate of 5 U.S.C. § 706 to this Court is to review and decide all relevant questions of law and to determine meaning or applicability of the terms of an agency action. 5 U.S.C. § 706. To this end, a reviewing Court is required to hold unlawful and set aside any agency action, finding, or conclusion which is found to be arbitrary, capricious, or an abuse of discretion. In making a determination, the Court must review the entire agency record or those parts of the record specifically cited to the Court by a party. EPA regulations are reviewed under Section 10 of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A)–(D). *Sierra Club v. EPA,* 540 F.2d 1114, 1123 (D.C. Cir. 1976); *Ethyl Corp. v. EPA,* 541 F.2d 1, 33–37 (D.C. Cir. 1976). Section 10 articulates the arbitrary and capricious standard of review.

 Generally, administrative action is entitled to judicial deference. When a Court reviews an agency's actions, there are three primary areas which must be considered and, depending upon what area is being reviewed, the scope of review varies. An agency's finding of fact, basic or raw facts, will withstand the scrutiny of judicial review if supported by substantial evidence on the whole record. Inferences or ultimate fact-finding will bear the burden of judicial examination if they have a "rational basis." Finally, when an analysis of an agency's activities involves a question concerning the meaning of a statutory term, the application of a statutory term to facts, or an agency interpretation of a statute, then the breadth of judicial review is much wider. The arbitrary and capricious standard precludes judicial inquiry where there is a rational basis for the agency action. *Sierra Club v. EPA, supra* at 1123. However, a Court is not required to rubber-stamp an agency decision as correct.

"To do so would render the appellate process a superfluous (although time-consuming) ritual. Rather, the reviewing court must assure itself that the agency decision was 'based on a consideration of the relevant factors * * *.' Moreover, it must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.' *Citizens to Preserve Overton Park v. Volpe,* supra, 401 U.S. at 415, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 . . . ." *Ethyl Corp. v. EPA,* 541 F.2d 1, 34–35 (D.C. Cir. 1976).

After a careful study and analysis of the record, the Court then must step back from the agency decision. *Ethyl Corp. v. EPA, supra* at 36. In those instances involving matters which are clearly within the expertise of the agency, the Court must show proper deference. On the other hand, in those matters falling within the clear purview of the Courts, such as interpreting the law, the Court must scrutinize them from a more critical perspective.

## THE REGULATIONS :

The EPA regulations in question here require that:

"No owner or operator shall commence construction or modification of a source subject to this paragraph unless the Administrator determines that [the source complies with the regulations]." 40 C.F.R. 52.21(d)(2).

The questioned regulations apply to any new or modified stationary source which did not commence construction or modification prior to June 1, 1975. 40 C.F.R. 52.-21(d)(1). The regulations define "commence" to mean that:

"An owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification." 40 C.F.R. 52.21(b)(7).

"Construction" is defined to mean *fabrication,* erection, or installation of an affected facility. 40 C.F.R. 52.21(b)(6). The regulations require preconstruction review of any new source which had not commenced a continuous program of construction or en-

tered a contractual obligation to complete a continuous program of construction prior to June 1, 1975.

This regulatory language was interpreted by the EPA in March and May of 1975. The interpretations then issued were in response to requests for determination of the "grandfather-ability" of Pacific Power & Light Company's Jim Bridger Unit No. Four and Portland General Electric's Boardman Plant. These rulings show that an agreement to purchase a turbine generator, the sharing of on-site facilities such as a water system and a transmission system, and contracts for major components amounted to a commencement of construction within the meaning of 40 C.F.R. 52.-21(b)(7). Montana Power has shown each of these elements was accomplished prior to June 1, 1975, with respect to Colstrip Units Three and Four.

Subsequently, the EPA issued two memoranda which interpreted the regulations concerning commencement of construction differently. These memoranda are the "Strelow Memoranda." The first was issued December 18, 1975;[4] the second memorandum was written and distributed April 21, 1976.[5] The memoranda were designed to provide guidance on how the phrase "commence" is to be interpreted. Page 1 of the December 18, 1975, memorandum instructs that:

"The purpose of the regulations to prevent significant deterioration is to assure that a source is not located at a site which would result in emissions from that source violating the applicable increment. Thus, the term 'commencement of construction', as that term is used in these regulations to prevent significant deterioration, refers to on-site construction. Ordinarily, therefore, only significant and continuous site preparation work, such as major clearing or excavation or placement, assembly, or installation of unique facility or equipment at the site should be considered a 'program of construction or modification' for purposes of § 52.-

21(b)(7). *However, each case must be reviewed on its own facts, as noted below."* (Emphasis added.)

The December 18th memorandum continues and further instructs that

"There may also be situations where, although actual on-site work has not commenced or been contracted for, the source is so irrevocably committed to a particular site that it should be considered as having commenced construction. Such situations could include . . . sources which have contracted for or constructed unique sites, specific facilities or equipment which are not yet being installed on site. Such situations will be rare but may be taken into account in determining whether the source is in effectively the same position as if it had commenced on-site construction.

"Because some sources may, in good faith, have construed § 52.21(b)(7) differently before this guidance and have since entered into binding commitments on the assumption that they were exempt from review, it is necessary to provide for such cases. Therefore, where a source has, in good faith, begun on-site construction or entered into a contractual obligation to begin on-site construction after June 1, 1975, on the good-faith assumption that the source was exempt from the significant deterioration regulation, *the source will not be subject to review.* Reliance on formal written statements by EPA personnel that the source in question would not be subject to new source review under these regulations would ordinarily be considered reasonable reliance in good faith [on] the assumption that the regulations do not apply to such sources."

The first Strelow memorandum also addresses the question of contractual obligations that amount to a continuous program of construction. On page 3 of the memorandum, it indicates that:

"Finally, 40 C.F.R. § 52.21(b)(7) states that an owner or operator has com-

---

4. Plaintiffs' Exhibit 40; Document #7, Administrative Record.

5. Plaintiffs' Exhibit 40; Document #8, Administrative Record.

menced construction not only when he has undertaken the continuous program of construction or modification himself but also when he has entered into a 'contractual obligation to undertake and complete, within a reasonable time a continuous program of construction or modification.' The question of whether a contract represents a 'contractual obligation' will depend upon the unavoidable loss of work to be suffered by a source if it is required to cancel such contract. It is clearly beyond the intent of these regulations, for example, to permit a source which has only a contract revocable at will to escape review under these regulations. Correspondingly, where the contract may be canceled or modified at an insubstantial loss to the plant operator, the proposed source should not be allowed to escape review under these regulations. The determination of whether a source will suffer a substantial loss if the contract were terminated and therefore whether there is, in fact, a 'contractual obligation', must be made on a case by case basis as there are no general guidelines that would cover all situations. Factors that would be considered would include the question of whether or not the contract could be executed at another site or modified for the site in question and the amount of any additional costs of constructing at another site or of canceling the contract."

There is a caveat on the last page of the Strelow memorandum which is most applicable in this case:

"As this guidance indicates, there is no clear line dividing those sources which are grandfathered and those which are not. Judgments must be made on a case by case basis. For this reason it is not possible to predict without knowing the facts of each case which sources are subject to PSD review."

█ Apparently some question arose concerning the Strelow memorandum interpretation of the regulations. Thus, a second memorandum was promulgated April 21, 1976. In it there was a clarifying instruction about contractual obligations.

"Thus, as a general rule, for one to qualify for the contractual exemption, *he must have contracted for continuous on-site construction work.* The discussion in the first full paragraph on page 3 of my December 18 memorandum is *not* intended to provide exceptions to the general rule. That discussion relates to situations in which *even though* a 'contract' for on-site work were executed prior to June 1975, *the 'contract' might still not qualify* the source for an exemption." (Emphasis in original.)

The Supreme Court of the United States in the case of *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), stated that:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman, supra* at 16, 85 S.Ct. at 801.

This position is adopted in the Ninth Circuit as well. *Brubaker v. Morton,* 500 F.2d 200 (9th Cir. 1974). However, the judicial deference to an administrative interpretation of a regulation is not an absolute requirement, especially when there are conflicting interpretations of the same regulations within an agency. The greatest deference must fall to those guidelines involving highly sophisticated scientific and technical interpretations.

As the Court stated in *Ethyl Corp.:*

"We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA, supra* at 36.

On the other hand, the least deference is due those interpretations which parallel the judicial function of giving meaning to

698

words used in governing statutes or regulations.

In the *Udall* case, the Secretary of the Interior had consistently construed an Executive Order relating to the disposition of public funds in Alaska not to bar the issuance of oil and gas leases. The interpretation had been repeated a number of times in public records. Furthermore, a number of leases had been developed, at great expense, in reliance on the Secretary's interpretation. The *Udall* Court held for this reason the administrative interpretation was mandated.

. The present case differs from the *Udall* case. The first Strelow memorandum interpreting the PSD regulations was not even promulgated until December of 1975, over five months after the effective date of the regulations and nearly a year after their adoption. Furthermore, the memoranda are intra-agency guidelines, not public records in the sense referred to by the *Udall* Court. Finally, if there had been any developmental reliance by the utility industry on the agency's interpretation, it would have been on the early interpretations, not on the Strelow memoranda. The principle of *Udall* that deference is due the agency's interpretation of the regulations addresses the extra-agency statements, not the intra-agency guidelines. An agency's public acts bear more weight than its private working papers. To overcome a good faith reliance on the former, the record must affirmatively reflect a basis to give deference to the latter. None exists in this case.

The final determinations that Colstrip Units Three and Four were subject to 40 C.F.R. 52.21 came about as the result of Montana Power's petition for a reconsideration of a February 26th ruling by the Agency. This final determination reaffirmed the Agency's position as of May 27, 1976. In this memorandum, the Agency took the position that the word "substantial" could only be measured as a relative concept rather than as an absolute concept. It found that:

"The word 'substantial' can only be measured in relative rather than actual terms; therefore, in this case the losses compared to the total project cost do not represent a 'substantial' amount. In arriving at this result, the agency has considered all the circumstances, including, among others, contract provisions, good faith and site specificity, surrounding the Company's claimed losses." Letter of October 14, 1976, from John Greene to William Coldiron.

The EPA found that Montana Power had submitted no new information which would lead the Agency to conclude that it had any reason to change the initial determination subjecting Units Three and Four to preconstruction review.

The Agency argues that its findings are not subject to serious dispute. It also urges that EPA's conclusions that the financial commitments to Units Three and Four, approximately 2.8% of the total project cost, are not sufficient to grandfather the Three and Four Units under the PSD regulations. The Agency determination is based on the following categorization and analysis:

(1) Costs found to be specifically within the EPA's definition of "contractual obligation";

(2) Costs which do not clearly fall within the parameters of the EPA interpretation of contractual obligation, but costs which could be construed by the Administrator to be within the obligation; and

(3) Costs which are not within the definition of contractual obligation. The itemized costs associated with Units Three and Four were alleged by Montana Power to be as follows:

| | | |
|---|---|---|
| Item I | 1.0M | [M = Million] Design studies by Bechtel Power Corporation |
| Item II | .8M | Environmental Analysis |
| Item III | .4M | Environmental Studies |
| Item IV | 1.2M | Application for Montana Facility Siting Certificate |
| Item V | 93.0M | Additional Cost due to Inflation if Facility Site Changed |
| Item VI | 8.7M | Cancellation Costs and Payments Made |
| Item VII | 8.8M | Prorated Excess Capacity of Units One and Two |

Item VIII – 2.6M – Engineering Design and Study for 500 Kilovolt Line

Item IX – 11.7M – Cost of Convertible 230 Kilovolt Line

Item X – .6M – Administration and Legal Costs.

These itemized costs can then be placed in the three categories previously suggested. The EPA assessed the costs in the following manner:

| Category 1 | Category 2 | Category 3 |
|---|---|---|
| Item VI – $8.7M | Item I – 1.0M | Item IV – 1.2M |
| | Item II – .8M | Item V – 93.0M |
| | Item III – .4M | Item IX – 11.7M |
| | Item VII – 8.8M | Item X – .6M |
| | Item VIII – 2.6M | |
| $8.7M | 13.6M | 106.5M |

In reaching its conclusion, EPA found that only Item VI, the cancellation costs and payments already made, was allowable. EPA further concluded that five of the items were not clearly allowable and thus excluded them from its considerations in determining whether or not the grandfather clause applied. The disallowed costs were Items I, II, III, VII, VIII, which total $13,600,000. Items IV, V, IX and X were disallowed. The disallowance was $93,000,-000 of estimated costs due to inflation in building Units Three and Four at another site, two years later than planned. Item IX, which amounted to $11,700,000 and involved building a 230 kilovolt transmission line, was found to be properly attributable only to Units One and Two by the Agency. Administrative and legal expenses amounting to $1,800,000, Items VI and X, were disallowed, as not being contractual obligations to undertake and complete, within a reasonable time, a continuous program of construction. In the reasoning implemented by the Agency, the investment/cost ratio, assuming the total project cost of $790,-000,000, would be as follows: For Category 1, $8,700,000, which is equal to 1.1% of the total project cost; Categories 1 and 2 equal $22,300,000, or 2.8% of the total project cost. The decision thus reached is that there was not a substantial irrevocable commitment to a continuing program of construction.

Essentially, the position taken by Montana Power Company is that all the costs are irrevocably committed expenditures incurred or to be incurred with regard to Units Three and Four. They assert that approximately $20,000,000 of these costs are the costs which should have been considered by the EPA in reaching its decision that the Power Company was subject to the prevention of significant deterioration standards.

The Power Company argues that the Agency's applications in interpreting the grandfather clause to Colstrip Units Three and Four is arbitrary and capricious. This is supported by evidence of the pre-Strelow memoranda rulings regarding the Jim Bridger and Boardman sources.

Of particular interest in this regard is a letter to Mr. H. H. Phelps, Vice President and Corporate Counsel of Portland General Electric Co., from Clifford Smith, Regional Administrator of Region X. The letter was in response to a request by Portland General Electric for a determination as to the applicability of 40 C.F.R. 52.21(d) to the coal generating plant to be constructed by Portland General Electric near Boardman, Oregon. The EPA found that Portland General Electric was not subject to the requirements of the prevention of significant deterioration standards:

"Specifically, EPA's attention has been directed to the agreement between PGE and Westinghouse Electric Corporation relating to the purchase of a turbine generator for the Boardman Plant. Based upon our review of the documents pertaining to the Westinghouse contract which you supplied as of May 1, 1975, and your letters of May 6 and 7, 1975, we conclude that PGE has 'commenced construction' within the meaning of 40 C.F.R. 52.21(b)(7) in that PGE has entered into a binding agreement for contractual obligations to undertake and complete within a reasonable time a continuous program of construction or modification.

"Accordingly, PGE is not subject to 40 C.F.R. 52.21(d), which only applies to a new or modified source which has not commenced construction or expansion prior to June 1, 1975." Letter to Mr. H. H. Phelps from Clifford V. Smith, Region X, EPA, May 15, 1975.

The Government argues that the determination made in the *Portland Electric* case was no precedent under the regulations. It predates the Strelow Memoranda and, argues the Government, is an incorrect interpretation of the regulations. The argument the Government makes would require accepting the premise that this early determination of the regulations was incorrect and therefore was not binding on EPA in making subsequent decisions. However, this overlooks the chronology of the sequence of events inherent in the planning and construction phases of any major construction undertaking. The effective date of the regulations is June 1, 1975. The *Portland General* decision was rendered by Region X of the EPA on May 16, 1975. The first notice Montana Power was given officially by the EPA that Colstrip Units Three and Four might not be grandfathered was the September 2, 1975, letter from the EPA to Montana Power. Montana Power responded on September 8, 1975, with a request for more information before submitting a final answer. On December 18, 1975, the first of the EPA's interpretative memoranda was issued. On February 3, 1976, Montana Power responded to the EPA's letter questioning the applicability of the prevention of significant deterioration standards to Units Three and Four. February 26, 1976, the Agency determined that the Colstrip Units Three and Four are subject to the preconstruction review and they are not grandfathered in under the prevention of significant deterioration regulations. Finally, in April of 1976, the second explanatory memorandum was issued within the Agency.

From these facts, it would seem that the reasonable interpretation of the regulations was that initially reached by Region X regarding the Portland General Electric Company. The early rulings reflect the plain meaning of the regulations. The intercorporate communication networks in industries like the utility industries are sophisticated and thorough. Thus, a very logical and a good faith interpretation by the Montana Power Company would be that its contractual commitments would exempt Units Three and Four from the preconstruction review.

In the Jim Bridger case, the Agency's position was that 40 C.F.R. 52.21(b)(7) was applicable to Unit Four of that construction project. A letter from Irwin Dickstein indicates that:

"The record in this matter contains representations that the site of this Unit has been chosen to allow the sharing of on-site facilities such as water system, transmission system, road, etc., with the existing Units One, Two and Three. Furthermore, the record reflects that prior to June 1, 1975, contracts for major components of the system had been entered into resulting in a commitment of approximately $60,000,000 which could not be breached without incurring cancellation charges in excess of $5,400,000. Based upon these facts, it is the determination of this office that the construction of Jim Bridger Unit No. Four 'commenced' as that term is defined in 40 C.F.R. 52.-21(b)(7) prior to June 1, 1975, in view of the irrevocable commitment made to construction at that particular site." [6]

When these two determinations are considered in the time context of both Montana Power's project planning at Colstrip Units Three and Four and the Strelow memoranda, it becomes apparent that the EPA has switched horses in midstream. The Agency's actions in this case are after the fact

6. The Government indicates in its briefs that it has been brought to EPA's attention that the $60,000,000 figure may substantially understate the real project cost of the Pacific Power & Light Company project. In this information,

the EPA says it is now reviewing its determination on that project.

Brief in support of a motion to deny the relief requested by the plaintiff, page 14.

and the determination reflects a policy switch which is not supported by the record.

The Agency interpretation of its own reg-. ulations reflects a certain policy. Courts are not wont to interfere with agency policy decisions for that is beyond the realm of judicial review. However, the question of fairness arises when a policy based on the apparently plain meaning of regulatory language is reinterpreted after the fact to read into the plain language requirements which are not on the face of the regulations. When the reinterpretation amounts to a policy change, it is the prerogative of the Courts to examine the record to see if there is a justifiable reason for the policy change. In this case, there is none.

■ Much of the determination made by the Agency in this case is predicated upon a ratio in determining what substantial commitments to a continuing program of construction are.[7] The ratio itself is not arbitrary or capricious. Its application can be. The function of the ratio is to establish a proper balance between entrepreneurial risks and social and economic utility. On-site, actual construction which had been going on for a continuous time would certainly be sufficient to exempt a source from the preconstruction review of the regulations. On the other hand, preliminary planning on an intracorporate level would not be sufficient to invoke the preconstruction exemption. The difficulty lies, as the Strelow memoranda indicate, with those cases that have not commenced on-site construction but have gone past the intracorporate planning stage. These cases involve costs which can be construed to be within the meaning of 40 C.F.R. 52.21(b)(7).

In such instances, what the agency must do is reach the equilibrium point between investor risk and irrevocable external commitments that amount to a continuing program of construction, a program based not on speculation but upon a well-designed construction plan.

The agency determination in this case fails to allow committed funds for planning. This disallowance is inconsistent with the requirement of building and planning a major industrial project. Implicit in the way the ratio formula has been applied to Montana Power Units Three and Four at Colstrip is an assumption that "substantial" must be measured in relative rather than absolute terms. This results in a capricious application of the policy designed to strike a balance between investor risk and social utility.

■ The manner in which the prevention of significant deterioration regulations have been applied to Colstrip Units Three and Four can be likened to an *ex post facto* law. To exercise its rule-making function, an agency must give notice of the proposed rules and allow interested parties an opportunity to be heard. The regulations enacted in this case have the force and effect of law. A retroactive change in the effect of these regulations cannot be permitted when it comes about as a result of a policy change predicated on intra-agency activities not subject to input from interested or affected parties. The agency action with regard to Colstrip Units Three and Four was arbitrary and capricious.

*INJUNCTIVE RELIEF:*

■ Having determined that the Agency's application of the prevention of significant deterioration regulations to Colstrip Units Three and Four was arbitrary and capricious, it is necessary to determine whether injunctive relief in this case would be appropriate. The decision to grant or deny a preliminary injunction lies in the discretion of the trial judge. To grant an injunction, the Court must find that the plaintiff has satisfied four distinct elements. *A Quaker Action Group v. Hickel*, 421 F.2d 1111 (D.C. Cir. 1969). Injunctive relief is appropriate if the plaintiff makes a strong showing of the likelihood of success on the merits. Secondly, the plaintiffs

---

7. The ratio is the cost of irrevocable commitments and expenditures to the total cost of the project.

must show that without the injunctive relief they would suffer irreparable injury. Third, the action to be stayed must not cause any significant harm or injury to the opposing parties. Finally, the plaintiffs must show that the balance of the public interest strongly favors their position rather than that of the administrator. *Sierra Club et al. v. Ruckelshaus*, 344 F.Supp. 253, 256–257, *supra.*

A basic proposition is that the fundamental function of a preliminary injunction is to preserve the *status quo* pending a determination of the action on the merits. *King v. Saddleback Junior College District*, 425 F.2d 426, 427 (9th Cir. 1970); *Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42, 45 (5th Cir. 1932). In this case, the plaintiffs are asking for a preliminary injunction which would allow them to commence on-site construction of a major new power plant. At the commencement of this action, the Power Company had not begun on-site construction at the Units Three and Four sites. Thus, an injunction at this point would allow a severe alteration in the status quo. Preliminary injunctive relief at this point would allow the plaintiffs substantially all the injunctive relief they could obtain on a final determination of the merits and must, therefore, be denied. *Tanner Motor Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

The only element the plaintiffs have affirmatively shown in this action is a strong likelihood of success on the merits. The plaintiffs have failed to meet the burden of showing they would be irreparably harmed if this Court denies preliminary injunctive relief. Nor have the plaintiffs shown that a preliminary injunction would not cause significant harm to the opposing parties. Finally, there is the element of the public interest. No party in this case has shown that the balance of the public interest weighs in its favor.

IT IS ORDERED that the defendant Environmental Protection Agency's motion for summary judgment be, and the same hereby is, denied.

IT IS FURTHER ORDERED that the plaintiffs' motion for a preliminary injunction is denied.

IT IS FURTHER ORDERED that the plaintiffs' prayer for a declaration from this Court that Units Three and Four of the Colstrip Generating Complex had "commenced construction" on or before June 1, 1975, within the meaning of 40 C.F.R. 52.-21(b)(7), and, therefore, that Units Three and Four are exempt from preconstruction review under 40 C.F.R. 52.21(d)(1) of the significant deterioration regulations, is granted.

The Clerk is directed to enter a separate order granting the plaintiffs declaratory relief in accordance with this order.

The parties are directed to inform the Court, by writing, of when they will be prepared to go forward with the presentation of evidence on the motion for a permanent injunction.

## ORDER TO ENTER FINAL JUDGMENT

The following motions were heard the 25th day of March, 1977, in the above-entitled action:

1. Motion of Plaintiffs to Supplement the Record of the Hearing.
2. Motion of Plaintiffs to Dismiss Claim for a Permanent Injunction.
3. Motions of Intervenors, Northern Cheyenne Tribe and Northern Plains Resource Council, for Amendment of Judgment.
4. Motion of Defendants for Entry of Final Judgment.

Plaintiffs appeared by and through their attorneys, John L. Peterson, John W. Ross, and William H. Bellingham; defendants appeared by and through their attorneys, Earl Salo, and Eugene F. Megyesy, Jr.; intervenors did not appear.

The plaintiffs' request for leave to withdraw their motion to supplement the record of the hearing is hereby granted.

After argument on the remaining motions, and in consideration of the briefs previously filed in support thereof,

IT IS HEREBY ORDERED that:

1. The motion of plaintiffs to dismiss their claim for a permanent injunction without prejudice is hereby granted and the said claim is hereby dismissed without prejudice.

2. The motions of intervenors, Northern Cheyenne Tribe and Northern Plains Resource Council, for amendment of judgment are hereby denied.

3. The motion of defendants for entry of final judgment is hereby granted.

The Court finds that all claims, issues, rights and liabilities of and between the parties to this action have been finally disposed of, adjudicated and determined in all respects and that accordingly there is no just reason for delay in directing a final judgment.

IT IS FURTHER ORDERED that the Opinion and Order dated January 27, 1977, entered and filed in this action on that day, is by reference made a part of this order.

IT IS FURTHER ORDERED that the judgment of this Court granting the plaintiffs' prayer for a declaration that Units Three and Four of the Colstrip Generating Complex had "commenced construction" on or before June 1, 1975, within the meaning of 40 C.F.R. 52.21(b)(7), and, therefore, that Units Three and Four are exempt from preconstruction review under 40 C.F.R. 52.-21(d)(1) of the significant deterioration regulations, be made the final judgment in this case.

The Clerk is directed to enter a final judgment by separate document granting the plaintiffs declaratory relief in accordance with this order.